Dennis COOPER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 71A03–9807–CR–329.

Court of Appeals of Indiana.

July 7, 1999.

Transfer Denied Aug. 31, 1999.

Susan K. Carpenter, Public Defender of Indiana, Gregory L. Lewis, Deputy Public Defender, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Sarah E. Scherrer, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge

Following a jury trial, Dennis Cooper was convicted of Child Molesting,[1] a class A felony. Two issues are presented in this appeal:

1. Ind. Code Ann. § 35–42–4–3(a) (West Supp. 1998).

1. Did Cooper fail to timely file his praecipe?

2. Did the trial court err in admitting, pursuant to the medical diagnosis or treatment exception to the hearsay rule, a nurse's testimony that the five- or six-year-old victim, S.A., told the nurse that Cooper had kissed her vaginal area?

We affirm.

The facts most favorable to the judgment are as follows. During 1997, Cooper and his wife Diane provided child care to five children, including S.A. While he was babysitting S.A., Cooper, whom S.A. referred to as "Poppie", took S.A. into the bedroom, pulled her underwear aside, and placed his tongue on her vaginal area. S.A. told her grandmother and parents about the molestation. After contacting police, S.A.'s parents took S.A. to the emergency room at the St. Joseph Medical Center for a physical examination.

Kimberly Torres, a registered nurse at the hospital, met with S.A. before the examination. S.A. told Torres that Cooper took S.A. into his and Diane's bedroom and that, while the two were in the bedroom, Cooper kissed her "down there . . . where [I go] pee." *Record* at 256. While S.A. made the above statement to Torres, S.A. pointed toward her genital area. In addition, S.A. demonstrated to Torres how Cooper pushed her underwear to the side when he performed such act. Torres testified that S.A. also told her that: "Poppie asked her to touch him where he goes pee and she said she said no". *Id.* Torres also testified that S.A. told her "that was all [Cooper] does is that and hugs and kisses her. Kisses her on the mouth." *Id.* Torres relayed this information to Dr. Jennifer Lackman, who performed the medical examination of S.A.

Dr. Lackman testified that the doctors at the hospital rely on the nurses' notes regarding the history and information obtained from the child and the parent and "do not repeat that with the patient." *Id.* at 261. Dr. Lackman further testified that she would not expect there to be any physical findings from a child being licked in the genital area. Her diagnosis was "possible sexual assault." *Id.* at 266.

Additional facts will be set forth where pertinent.

1.

The State claims that Cooper failed to timely file his praecipe and that this court should therefore dismiss his appeal for lack of jurisdiction. The resolution of this issue involves the interplay of the Indiana rules of appellate, trial, and criminal procedure.

The sentencing order in this case was entered by the trial court on June 16, 1998. Cooper therefore had until July 16, 1998 to timely file his praecipe. *See* Ind. Appellate Rule 2(A) (unless a motion to correct error is filed, the praecipe shall be filed within thirty days after the entry of a final judgment or an appealable final order). *See also* Ind.Crim. Rule 19. Unless the praecipe is filed within the required time period, the right to appeal is forfeited. App. R. 2(A); Crim. R. 19.

Cooper's praecipe was date stamped as being filed with the St. Joseph Superior Court Clerk on July 20, 1998. However, Cooper's certificate of mailing indicates that his praecipe was mailed to the trial court clerk by certified mail, return receipt requested, on July 15, 1998.

The Indiana Rules of Trial Procedure "govern the procedure and practice in all courts of the state of Indiana in all suits of a civil nature." Ind. Trial Rule 1. The trial rules also apply to all criminal proceedings as long as they are not in conflict with any specific rule adopted by our supreme court for the conduct of criminal proceedings. Crim. R. 21. T.R. 5(E) provides in pertinent part: "The filing of pleadings, motions, and other papers with the court as required by these rules shall be made by one of the following methods: * * * (3) Mailing to the clerk by registered or certified mail return receipt requested. . . ." When papers are filed in the manner set forth in T.R. 5(E)(3), filing "shall be complete upon mailing." T.R. 5(E). Accordingly, the filing of Cooper's praecipe was complete when it was deposited in the mail. *See* T.R. 5(E). *See also Seastrom, Inc. v. Amick Constr. Co., Inc.,* 159 Ind.App. 266, 306 N.E.2d 125 (1974) (all filings may be accomplished by mailing to the

clerk of the court by registered or certified mail, return receipt requested, and filing is accomplished upon deposit in the mail).

Cooper did not fail to timely file his praecipe.

2.

We next address whether the trial court erred in admitting, pursuant to the medical diagnosis or treatment exception to the hearsay rule, Nurse Torres's testimony that S.A. told her that Cooper had kissed her vaginal area.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not admissible except as provided by law or the rules of evidence. Evid. R. 802. In *McClain v. State*, 675 N.E.2d 329 (Ind.1996), our supreme court discussed the exception to the hearsay rule contained in Evid. R. 803(4) for statements made for the purpose of medical diagnosis or treatment. In *McClain*, the trial court permitted a therapist to testify, pursuant to the medical diagnosis or treatment exception, about statements made to her by a child molestation victim with regard to the details of the molestation. Our supreme court in *McClain*, which ultimately determined that the therapist's testimony was erroneously admitted but harmless, stated:

> Indiana Evidence Rule 803(4) establishes a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or the external source thereof insofar as reasonably pertinent to diagnosis or treatment." This exception is based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely the declarant will mislead the person he wants to treat him. Statements made to non-physicians may fall within Evid. R. 803(4) if the statement is made to promote diagnosis or treatment.

*McClain v. State*, 675 N.E.2d at 331 (citations omitted). The court also stated:

The underlying rationale for this hearsay exception requires a two-step analysis for evaluating whether a statement is properly admitted pursuant to Evid. R. 803(4): 1) is the declarant motivated to provide truthful information in order to promote diagnosis and treatment; and 2) is the content of the statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment.

In order to satisfy the requirement of the declarant's motivation, the declarant must subjectively believe that he was making the statement for the purpose of receiving medical diagnosis or treatment. Often, for example where a patient consults with a physician, the declarant's desire to seek and receive treatment may be inferred from the circumstances. Where that inference is not obvious, as in this case involving a young child brought to treatment by someone else, there must be evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information. Here the requisite indicia of reliability are missing. There is no evidence that the victim sought the therapist's help or that he believed he was receiving any treatment. The child testified that [the therapist] was his "counselor" and that he talked to her about what McClain did to him. Thus, the record is devoid of any evidence showing that the victim understood that he was speaking to a trained professional for the purposes of obtaining diagnosis of, or providing treatment for, emotional or psychological injuries. Because the declarant's motive to promote treatment or diagnosis is crucial to reliability, the therapist's testimony was not shown to be within the medical diagnosis or treatment hearsay exception.

*Id.* (citations omitted).

Applying the two-step analysis set forth in *McClain* to this case, we conclude that Torres's testimony was properly admitted into evidence. Certainly, the second step of the analysis, whether the content of the statement is such that an expert in the field

would reasonably rely on it in rendering diagnosis or treatment, has been met.

Turning next to the first step of the analysis, *i.e.*, whether the declarant, here S.A., was motivated to provide truthful information in order to promote diagnosis or treatment, we look to the testimony of Nurse Torres. At trial, Torres described the procedure generally followed when a child comes into the hospital alleging that she is a victim of a sexual assault. In the following testimony, Torres described the procedure she generally followed after notifying various agencies of an alleged assault, the specific procedure she followed with S.A. in this case, and what S.A. told her about the molestation:

A. If we're able to do the exam, we'll try and bring them back into a room and generally *we introduce ourselves to the child,* to the mother, anybody else that's there, *and have the child get to know us,* try to make it a little bit social, little bit comfortable for them so they don't feel like they're—anybody is scared to come to the emergency room so that way they don't feel so scared. We give them coloring books, try and keep them occupied.

Q. How do you find out what happened to the child?

A. *After you do the initial trying to get to know the child,* see what their, how they act, if they're open, and if they're a little quiet, and very scared, *generally I'll just take my time, let them color for a while, just let them know who I am and who the doctor is, and once that's established, I'll generally talk to the parents first, to see what it was that brought them in in the first place. What it was that they were told, and then I'll start addressing the child,* ask them if they know why they're in the emergency room, and let them know that they're not there because of something they did wrong. They are always afraid that they did something wrong.

Q. *When you're dealing with the child, you tell them who you are and what your job is?*

A. *Um-hum.*

Q. *What typically do you say?*

A. *I usually tell them my name is Kim and I'll be their nurse and I'll be with them the whole time, and I tell them who the doctor is.* Generally if it's a female doctor that we have on, since, most of the cases are female, I try to get the female doctor so I'll know already which doctor's going to go, so *I'll tell them who the doctor is and I give them a rough view of the things we're going to do,* we're going to be talking to them, the police will be talking to them, sex offense services will come in and color with them and keep them busy and then see if they have any questions and answer their questions and just take it from there. *Let them know what they are going to expect, what the doctor is going to do, that it's okay for the doctor and the nurse to take a look at them* because mom or dad's present and it's a good touch and not a bad touch with mom or dad, but it's okay.

Q. *So after you have talked to the child about that, and kind of given them a preview of what's going to happen, is that then when you ask the child what happened to the child?*

A. *Um-hum.*

Q. And after you have that disclosure from the child, what happens next in terms of the protocol that's followed at St. Joe?

A. We have quite a bit of paperwork to fill out. We start getting the paperwork filled out, and then I give the physician a report on what was reported to me and when they have a moment we go in and do the exam.

Q. Okay. So there's a bunch of paperwork. Would you record what the child says to you in that paperwork?

A. Sometimes, not always, because children get a little—seem to get a little intimidated when you are writing and they don't think you're listening, so sometimes we'll take a piece of paper and just jot things down instead of

filling out the paperwork in front of them.

Q. And after that you said you move on to the exam. Now do you do the exam?

A. No, the physician does.

Q. And before doing this exam, does the doctor review what you have done to date?

A. Yes.

Q. And why is that?

A. So it's consistent. She knows what she's going to do when she goes in there, and how she's going to address the child and what to look for, if it was something that was allegedly one orifice as opposed to another, then we'll do the exam appropriately.

Q. So does the child's disclosure dictate the exam that's going to be conducted by the doctor?

A. We always do samples from all three orifices; oral, rectal and vaginal. But if there's something else alleged there possibly could be some other exam done. If the child is having urinary symptoms because of something else, then we can possibly do a urinalysis as opposed to just strictly the sexual assault samples.

Q. *And the procedure that you have just described, I'm sorry. Let me back up. Let me now focus more particularly on October 6th of 1997, okay? Were you working that day?*

A. *Yes.*

Q. *And were you involved in the examination of the little girl named [S.A.]?*

A. *Yes.*

Q. And how did you become involved?

A. Generally the charge nurse picks whoever is available or has less patients or less critical patients at the time.

Q. *Did you become then the nurse that was assigned to [S.A.]?*

A. *Yes.*

Q. *And did you follow the procedure you have just described for us that is typically followed in dealing with a child who comes in alleging sexual assault?*

A. *Yes.*

Q. *So what did you do first; can you tell us?*

A. Usually I—every nurse has their own way of approaching things, but generally it's the same procedure. *I usually go in and introduce myself* and get the child to tell me what their name is, and try and joke around with them; let them know it's okay to be here. Try and set them at ease, let mom stay in the room. Anybody that they want in the room stay in the room with them. Just get to know the child.

Q. *And with [S.A.], did you do that?*

A. *Yes.*

Q. When you met [S.A.], do you recall was she waiting in the waiting room or in the Linsey Room; where was she?

A. I believe she was in the Linsey Room and then I believe the police were there for a little bit so she was out coloring. We have a little child area in the waiting room. She was out coloring with her little sister and they brought her back.

Q. *When you met with [S.A.], did you tell her what you do and describe— what did you say to her?*

A. *What my name is, what her name is, just let her know a little bit about what she's doing. Her mom brought her in because of something, and if she's going to tell me what that something is when she feels comfortable to talk to me about it.* If she doesn't want somebody in the room or does want somebody in the room, sometimes they want the parents in the room, sometimes they don't. Whatever makes the child feel comfortable.

Q. *Did [S.A.] talk to you about what happened to her?*

A. *After a little bit.* She was pretty quiet, she was coloring quite a bit, during most of the questioning she was coloring.

Q. Was that unusual?

A. No. *Most kids even though you try and set them at ease, they still think*

*they did something wrong or think because they're in emergency they are going to get a shot,* just get scared.

Q. *So you asked [S.A.] what happened?*

A. *Um-hum. I asked her if she knew why she was there in the emergency room, and I believe she thought she was going to get an exam. She needed to get examined, but she didn't know why.*

Q. *Did you tell her why?*

A. *Um-hum; no I asked her why. What she told mom that brought her into the emergency room.*

Q. *Did she tell you what happened to her?*

A. *Yes.*

Q. What did she say?

\* \* \*

[Whereupon a side bar conference ensued about whether Torres's testimony of what S.A. told her was inadmissible hearsay.]

Q. Yes?

A. She. was coloring when she was discussing things. I think she told me that Poppie takes her into his and Diane's bedroom and has her lay down on the bed, and then he kisses her down there and she points to her genital area and says where she goes pee. And I asked her to show me what Poppie does because she also had told me that she didn't have her clothes off, she had her underwear on. And she put her underwear to the side and didn't take them off and says that's how he does it. She said ' Poppie asked her to touch him where he goes pee and she said she said no, and she said that was all he does is that and hugs and kisses her. Kisses her on the mouth.

*Record* at 248–56 (emphasis supplied).

The above quoted portion of the record to which we have added emphasis provides a proper basis for the trial court's admission into evidence of the hearsay statements made by Torres which were attributed to S.A. As Torres's testimony makes clear, S.A. knew that she was in the emergency room for an examination by a physician because of the molestation by Cooper. S.A. sufficiently understood the professional role of both the nurse and the doctor who examined her, thus triggering the motivation to provide truthful information. The trial court did not err therefore in admitting, pursuant to the medical diagnosis or treatment exception to the hearsay rule, Nurse Torres's testimony that S.A. told her that Cooper had kissed her vaginal area.

Judgment affirmed.

BAILEY, J., and STATON, J., concur.