**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**JOHN QUIRK**
Public Defender
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana



FILED

Apr 03 2013, 9:07 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BENJAMIN A. HANKINS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 18A02-1207-CR-611 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Alan K. Wilson, Judge
Cause No. 18C02-1106-MR-1

**April 3, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Benjamin A. Hankins appeals his conviction for Murder,[1] as well as the sentence imposed by the trial court.  Hankins presents the following issues for our review:

1.  Did the trial court abuse its discretion in allowing a licensed clinical social worker to testify to statements made by Hankins and the victim's four-year-old daughter?

2.  Did the trial court consider aggravating factors that were not supported by the record?

We affirm.

Hankins married Lisa Annette "Nettie" Peterson in 2001, and the couple had three children.  In August 2010, the couple separated, and Nettie and children moved into Nettie's parents' home.  Nettie filed for divorce in September 2010 and began dating another man the following month.  Hankins did not want a divorce due to his religious beliefs and because he believed his parents' divorce had destroyed his family.  After Nettie moved out, Hankins sent her a number of angry text messages, calling her evil, a hypocrite, an adulteress, a liar, and a slut, and at one point telling her that her "day of reckoning [was] coming".  *Exhibit Volume* at 67.

On the morning of June 3, 2011, after Hankins returned home from his night shift as a correctional officer at Pendleton Correctional Facility, Nettie drove the children to Hankins's home where the two older children caught the school bus.  At 7:20 a.m., Hankins sent a photograph of Nettie performing a sex act to Nettie's cell phone, along with the following text message:  "Since you intend on sharing yourself with other men how about I share all

---

[1] Ind. Code Ann. § 35-42-1-1 (West, Westlaw current through 2012 2nd Reg. Sess.).

these pics. Yes I have all of them." *Id.* at 205. Nettie left the youngest child, four-year-old J.H., in the car and went into Hankins's house. At about 7:25 a.m., a neighbor heard gunshots; Hankins had shot Nettie multiple times, including once in the chest. Hankins waited until 7:44 a.m. to call 911 and request an ambulance. Hankins told the 911 operator that he had shot Nettie after she had pulled a gun on him. When a 911 operator instructed Hankins to perform CPR, he did not do so.

When Delaware County Sheriff's Deputy Rick Richman arrived at 7:54 a.m., he found J.H. in the back seat of Nettie's car, and he met Hankins near the doorway. Hankins told Deputy Richman "she's in there dying" and "she grabbed my gun." *Transcript* at 720-21. Deputy Richman then entered the home and found Nettie lying on the floor. Nettie was blood-soaked, pale, and not breathing, but she had a pulse. At that point, paramedics arrived and Nettie was transported to the hospital by ambulance. Upon arrival at the hospital, Nettie had lost seventy-five percent of her blood volume and had a very weak pulse. Despite the best efforts of medical personnel to revive her, Nettie died a short time later.

During a subsequent interview with the police, Hankins claimed that he and Nettie argued about babysitting costs, parenting issues, and the photograph he had sent her. Hankins claimed that Nettie grabbed one of his guns, which was in a gun belt hanging on a chair, pointed it at him, and demanded that he delete the photographs. Hankins stated that he then grabbed another gun from his couch and shot Nettie more than once. Hankins also stated that at one point, J.H. came up to the house and he quickly shut the door and told her to go back to the car.

3

Analysts found no fingerprints or blood on the holster or gun that Hankins claimed Nettie pointed at him that morning. The gun Hankins used to shoot Nettie was marked by over fifty bloodstains, including high velocity impact spatter consistent with Hankins being two to three feet away from Nettie when he shot her. An autopsy revealed six separate gunshot wounds on Nettie's body. Dr. Paul Mellen, the pathologist who performed the autopsy, testified that Nettie had been shot between three and six times. Dr. Mellen testified that if only three shots were fired, the trajectories would have required Hankins to have shot Nettie from above while she was on her back with her legs flexed upward toward her body. Bloody footprints matching Nettie's shoes were found on Hankins's t-shirt.

Six days after the shooting, the State charged Hankins with Nettie's murder and filed a notice of intent to seek a sentencing enhancement pursuant to Ind. Code Ann. § 35-50-2-11 (West, Westlaw current through 2012 2nd Reg. Sess.) based on Hankins's use of a firearm in the commission of the offense. A jury trial commenced on April 2, 2012, and Hankins was found guilty of murder. Thereafter, in a bifurcated proceeding on the sentencing enhancement, the jury found that Hankins had used a firearm in the commission of the crime. Hankins was later sentenced to sixty years for murder, enhanced by four years under I.C. § 35-50-2-11.

1.

Hankins first argues that the trial court abused its discretion by allowing a licensed clinical social worker to testify to statements J.H. made during counseling. The decision to admit or exclude evidence lies within the trial court's sound discretion. *Filice v. State*, 886

N.E.2d 24 (Ind. Ct. App. 2008), *trans. denied*. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Dixon v. State*, 967 N.E.2d 1090 (Ind. Ct. App. 2012). We will not reverse absent a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Johnson v. State*, 831 N.E.2d 163 (Ind. Ct. App. 2005), *trans. denied*.

At trial, the State called Patricia Savage, a licensed clinical social worker who conducted counseling sessions with J.H. and her siblings. Savage testified to a number of statements J.H. made concerning what happened on the day of the shooting. Specifically, Savage testified that J.H. told her that her mother went to her father's house to talk to him about school, and that she waited in the car with the window down. J.H. told Savage that she heard screaming and then went to the door and opened it, and she heard her father tell her mother to "lay down and die." *Transcript* at 798. She said that her father had blood on his face, chest, and arms, and was wearing his uniform. J.H. stated further that her father slammed the door and yelled "get back into the car" and that she cried, was shaking, and her brother and sister were already gone on the bus. *Id.* Finally, Savage testified that J.H. told her the police came, and then her grandma came, and that she was scared.

Hankins argues that J.H.'s statements to Savage were inadmissible hearsay. Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. *Boatner v. State*, 934 N.E.2d 184 (Ind. Ct. App. 2010). As a general rule, hearsay is inadmissible unless the statement falls within one of the established hearsay exceptions. *Yamobi v. State*, 672 N.E.2d 1344 (Ind. 1996).

5

The trial court acknowledged that J.H.'s statements to Savage were hearsay, but concluded that they fell within the exception for statements made for the purposes of medical diagnosis or treatment set forth in Ind. Evidence Rule 803(4). The rationale behind the rule is that such statements are reliable because people seeking medical treatment have an incentive to tell the truth. *In re Paternity of H.R.M.*, 864 N.E.2d 442 (Ind. Ct. App. 2007). The rule is not limited to statements made to physicians, so long as the statements are made to advance medical diagnosis and treatment. *Id.* Statements to family therapists and clinical social workers are admissible under the rule so long as they are made for the purposes of medical diagnosis or treatment.[2] *McClain v. State*, 675 N.E.2d 329 (Ind. 1996); *In re Paternity of H.R.M.*, 864 N.E.2d 442.

To determine whether a statement was made for the purposes of medical diagnosis or treatment, we engage in a two-step inquiry. *In re Paternity of H.R.M.*, 864 N.E.2d 442. First, we must consider whether the declarant was motivated to provide truthful information in order to promote diagnosis and treatment, and second, whether the content is such that an

---

[2] Hankins makes a conclusory allegation that Savage "was a licensed clinical social worker but was not appointed by another governmental agency and did not have the proper training or specialization to be giving a diagnosis or treatment to this minor child." *Appellant's Brief* at 8. Contrary to Hankins's argument on appeal, Savage testified that she received her Master's degree in 1988 and was therefore qualified to make clinical diagnoses based on the DSM-IV. She testified further that she diagnosed and treated J.H. and her siblings for Post-Traumatic Stress Disorder. Hankins has not provided any authority to support his argument that Savage needed further education or specialization in order to be qualified to provide a diagnosis or treatment for J.H. In any event, Evid. R. 803(4) looks to the declarant's purpose in making the statement and the content of the statement, not the qualifications of the person to whom the statement is made. *See McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996) (noting that "[t]he Advisory Committee's Note to Federal Evidence Rule 803(4) states: 'Under the exception the statement need not have been made to a physician. Statements made to hospital attendants, ambulance drivers or even family members might be included.'").

expert in the field would reasonably rely on it in rendering diagnosis or treatment.[3] *Id.* Because Hankins does not dispute that J.H.'s statements were of the sort that an expert in the field would rely upon in rendering diagnosis or treatment, we analyze only whether J.H. was motivated to provide truthful information to facilitate treatment and diagnosis.

In order to satisfy this requirement, "the declarant must subjectively believe that he was making the statement for the purpose of receiving medical diagnosis or treatment." *McClain v. State*, 675 N.E.2d at 331. When a patient independently seeks out and consults with a physician, the declarant's desire to seek and receive treatment may be inferred from the circumstances. *McClain v. State*, 675 N.E.2d 329. Where, as here, a young child is brought to treatment by someone else, the inference is not obvious. *Id.* In such cases, "there must be evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information." *Id.* at 331.

In *McClain v. State*, the defendant argued that a child victim's statements to a therapist were improperly admitted under Evid. R. 803(4). Our Supreme Court agreed, noting that although the child testified that the therapist was his "counselor" and he told the therapist what had happened to him, there was no evidence that the child sought the therapist's help or understood that he was receiving treatment. *Id.* at 331; *see also In re*

---

[3] Hankins seems to suggest that there is a third requirement for the admissibility of statements under Evid. R. 803(4)—that the statements must be deemed reliable. Hankins has not directed our attention to any authority imposing such a requirement in addition to the two requirements set forth above. Instead, the two-part test is designed to ensure that the statements were indeed made for the purposes of medical diagnosis and treatment, which is itself a sufficient hallmark of reliability. *See McClain v. State*, 675 N.E.2d at 331 (noting that Evid. R. 803(4) is "based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely the declarant will mislead the person he wants to treat him" and that "[t]he underlying rationale for this hearsay exception requires" the application of the two-part test set forth above).

*Paternity of H.R.M.*, 864 N.E.2d 442 (finding that child's hearsay statements to clinical social worker were not admissible under Evid. R. 803(4) where there was no indication that child knew social worker's role or that he was being interviewed for the purpose of medical diagnosis).

On the other hand, in *Cooper v. State*, 714 N.E.2d 689 (Ind. Ct. App. 1999), *trans. denied*, this court concluded that the State presented sufficient evidence to establish that a child was motivated to provide truthful information in order to promote diagnosis and treatment. In that case, a nurse testified to the child victim's statements concerning the defendant's acts of child molestation. At trial, the nurse described at length the procedure she followed with the child, indicating that she introduced herself to the child, let the child get to know her, and explained the interview and examination process to her. The child ultimately disclosed to the nurse that the defendant had molested her. This court concluded that the nurse's testimony provided a proper basis for the admission of the child victim's statements under Evid. R. 803(4) because it demonstrated that the child "knew that she was in the emergency room for an examination by a physician because of the molestation by Cooper" and "sufficiently understood the professional role of both the nurse and the doctor who examined her, thus triggering the motivation to provide truthful information." *Id.* at 694.

We conclude that the facts of this case are far more similar to those in *Cooper v. State* than those in *McClain v. State* or *In re Paternity of H.R.M.* Upon Hankins's objection to

8

Savage's testimony, the trial court held a bench conference outside the presence of the jury.

During the conference, Savage testified as follows:

> Q: During that session, did you explain why they were there, to the children?
> A: Yes. I always explain my role because our office looks a lot like a doctors office, and I always tell them that I'm a counselor and I don't give medications or shots, and that we talk about what was going on, and that they were there for the purpose of talking about what had happened that day.
> Q: Did they appear to understand that?
> A: Yes.
> Q: Did you explain to them whom you were and what your role was?
> A: Yes. I tell them that I'm a counselor and the purpose of counseling is to talk about there [sic] feelings, and to deal with not only what has happened to them, but what is currently happening to them. To talk about their feelings. I also talked with them about whether or not they knew the difference between the truth and a lie.
> Q: Did they seemed [sic] to understand what your role was?
> A: Yes.
> Q: And you said you explained to them, that the difference between of the truth and a lie?
> A: Yes.
> Q: Okay. Did they appear to be able to tell the difference between the truth and a lie?
> A: Yes.
> Q: Did the children have any questions for you, as far as why they were there, or what your role was, or what the purpose of the counseling was?
> A: No.

*Transcript* at 771-72.

At the conclusion of the bench conference, the court overruled Hankins's objection.

Thereafter, the jury was brought back in, and Savage took the stand. Before describing the

statements J.H. made to her concerning the events surrounding the shooting, Savage gave a

further description of her interaction with J.H.:

> Q: During that session, did you introduce yourself to her?
> A: Yes.
> Q: Did you explain why she was there?

9

A: Yes.
Q: Did you explain who you were?
A: Yes, I did.
Q: Did you explain what your role was?
A: Yes.
Q: Did [J.H.] appear to understand your role?
A: Yes, she did.
Q: Did you inform [J.H.] the importance of being up, open, and honest?
A: Yes.
Q: Did [J.H.] appear to be able to tell the difference between the truth and a lie?
A: Yes, she did.

*Id.* at 796-97.

In light of this testimony, the record is not, as Hankins contends, devoid of evidence that J.H. was motivated to provide truthful information. Savage testified that she explained her role as a counselor and the purpose of the counseling relationship. Savage made J.H. aware that they were there to discuss the events surrounding her mother's shooting and the feelings she was experiencing as a result. Savage further discussed the difference between telling the truth and a lie and informed J.H. of the importance of being open and honest in counseling. This testimony is sufficient to establish that J.H. was motivated to provide truthful information to promote diagnosis or treatment. Accordingly, the trial court did not abuse its discretion in admitting J.H.'s statements to Savage pursuant to Evid. R. 803(4).

2.

Next, Hankins argues that the trial court abused its discretion in imposing his sentence. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion.

10

*Id.* "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id.* at 491 (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)).

A trial court may abuse its sentencing discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law.[4] *Anglemyer v. State*, 868 N.E.2d 482. If the trial court abuses its discretion in one of these or another way, remand for resentencing is the appropriate remedy "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.* at 491.

Hankins argues that the trial court abused its discretion by relying on aggravating factors that were not supported by the record. Hankins first takes issue with the trial court's reliance on the fact that Hankins did not call 911 right away, and its finding that, if he had done so, "[t]he death could possibly have been avoided despite the shooting." *Transcript* at

---

[4] We note that Hankins cites to our Supreme Court's decision in *Taylor v. State*, 840 N.E.2d 324 (2006) for the proposition that when a court assigns a sentence other than the presumptive, it must provide a statement of reasons for doing so. *Taylor v. State* was decided under the pre-*Blakely* presumptive sentencing scheme. In 2005, the sentencing statutes were amended in order to resolve the constitutional infirmities presented by the presumptive sentencing scheme, which our Supreme Court identified in *Smylie v. State*, 823 N.E.2d 679 (Ind. 2005). In *Anglemyer v. State*, 868 N.E.2d 482, our Supreme Court articulated the standard applicable to claims that a trial court abused its sentencing discretion under the 2005 sentencing amendments, and we apply that standard here.

1095. Hankins does not appear to dispute that he did not immediately call 911; indeed, the evidence presented at trial indicates that approximately twenty minutes elapsed between the shooting and the first 911 call. Instead, Hankins argues that Dr. Mellen's testimony "indicated that the victim needed aggressive fluid resuscitation[,] blood transfusion[,] and chest surgery in an operating room and probably intensive care . . . within fifteen minutes of the shooting." *Appellant's Brief* at 11. Hankins also points out that the first 911 call was made at 7:44 a.m., but that the ambulance did not depart for the hospital until 8:28 a.m., well outside this fifteen-minute time frame. Thus, Hankins essentially argues that even if he had called 911 right away, Nettie still would have died.

Dr. Mellen did not, as Hankins suggests, definitively state that Nettie required treatment at a hospital within fifteen minutes in order to survive. Dr. Mellen gave the following testimony:

> Q: Okay. Can you tell in this particular case how long that would have taken or how long it would have taken for an individual to, as you indicated, to bleed to death?
> A: I couldn't give an exact time.
> Q: Okay, so it could be a matter of a few minutes?
> A: I think that's probably fifteen minutes or more roughly.
> Q: Okay, so . .
> A: I guess I couldn't give a time. It's just a rough estimate. It's not an immediate like gunshot wound to the heart, that's going to personal extanuate [sic] and will bleed out within seconds or a minute. But its [sic] not a trigger wound. She had two (2) major wounds in the thigh. *You know that's, I couldn't give an exact time. I would say roughly fifteen minutes (15) minutes or more. It's a gradual process of the blood loss and going into shock.*
> Q: And whenever you say "needs treatment". That's not just when a paramedic shows up. Is that correct?
> A: Ahh.
> Q: What type of treatment I guess would be necessary?
> A: For these wounds?

12

Q: Yes.

A: Blood transfusion and chest surgery.

Q: Okay, so they would have to be actually in a . . .

A: which would require aggressive fluid resuscitation. Blood transfusion and chest surgery in an operating room, and probably intensive care.

Q: Okay so things in a medical hospital. Is that correct?

A: For these wounds, hospital care yes.

Q: Not things that could have be done [sic] by an emergency medical technician or by an ambulance?

A: You would have to begin some fluid resuscitation with saline; but this would require more than that.

Q: Okay, so let's make sure that I'm getting this straight, okay. She would require within fifteen (15) minutes or more. She would require emergency medical care, in a hospital surgery facility?

A: That's in general yes. *I'm not sure about the fifteen (15) minutes or more. The goal is under one (1) hour. As soon as possible. Her injuries would require IV fluid, which the EMT could start. That would not be sufficient to reverse everything. It would also require a blood transfusion and chest surgery, and that would have to be done at a sophisticated hospital.*

*Transcript* at 395-96 (emphasis supplied).

Dr. Mellen repeatedly stated that he could not give an exact timeframe within which Nettie needed treatment in order to survive, but estimated that it would have been fifteen minutes *or more*. Dr. Mellen also gave his opinion that a seventeen-minute delay between the shooting and the 911 call would have affected the likelihood of successful resuscitation. In any event, the court did not find a significant probability that Nettie would have survived had Hankins immediately called 911. Rather, its finding reflected its conclusion that Nettie initially had *some* chance of surviving the devastating injuries Hankins inflicted upon her, and that chance, however remote, was foreclosed when Hankins failed to summon help immediately. We cannot conclude that the trial court's finding in this regard was unsupported by the record.

13

Hankins also argues that the trial court abused its discretion in finding as an aggravating circumstance that Hankins failed to administer first aid to Nettie even though he had received first aid training as part of his work as a reserve police officer. Again relying on Dr. Mellen's testimony, Hankins argues that administering first aid would have been futile. When asked whether CPR would have had any effect on Nettie's chances of survival, Dr. Mellen responded as follows: "Not really because the CPR is basically to continue your heartbeat. The problem here is not that she did not have a heartbeat; but she had no blood circulation. No blood to be circulated. So CPR, although some may instruct that, that's not the indicated treatment here." *Transcript* at 397.

As an initial matter, we note that this testimony speaks only to the need for performing CPR; it does not address whether and to what extent other forms of first aid could have been helpful. In any event, we believe Hankins's argument in this regard misses the point. The trial court did not find that Nettie would have survived if Hankins had administered first aid. Rather, it properly considered Hankins's failure to do so as part of the nature and circumstances of the offense. Hankins chose not to provide any aid to Nettie, despite the fact that he had received first aid training, and he refused to perform CPR even after being instructed to do so by a 911 operator. Moreover, Hankins admitted to the police that as he knelt next to Nettie on the floor after shooting her, she grabbed his arm and asked him to help her. Hankins's refusal to do so evidenced his indifference toward Nettie's suffering and imminent death.

14

Finally, Hankins argues that the trial court abused its discretion by finding as an aggravating circumstance that the injuries Nettie suffered were significant and greater than necessary to prove the commission of murder. Hankins argues that "[t]he elements of the charged offense and the injury suffered, death, are the exact same needed to prove the crime of murder. You cannot have the offense of Murder without the death of a human being." *Appellant's Brief* at 12.

Hankins's argument is unpersuasive. Although every murder must necessarily include the loss of human life, not all murders are the same. They may vary in the degree of brutality inflicted, the extent of suffering endured by the victim, and many other ways. In this case, Hankins shot Nettie multiple times within earshot of their daughter, and then left her bleeding on the floor for nearly twenty minutes before calling 911. By Hankins's own admission, Nettie was conscious for at least some of this time. By the time she arrived at the hospital, Nettie had lost seventy-five percent of her blood volume. Under these facts and circumstances, we cannot conclude that the trial court abused its discretion in finding as an aggravating factor that Nettie's injuries were significant and greater than necessary to prove murder. For all of these reasons, we conclude that the trial court did not abuse its discretion in sentencing Hankins.[5]

---

[5] Hankins also states that his sentence is "manifestly unreasonable." *Appellant's Brief* at 10, 12. Because Hankins has not developed any argument in support of this claim or cited to supporting authority, his argument is waived. *See Bigler v. State*, 732 N.E.2d 191 (Ind. Ct. App. 2000) (holding that error was waived for failure to present a cogent argument), *trans. denied*. Nevertheless, we note in passing that Hankins appears to be referencing the former Ind. Appellate Rule 17(B), which called for the affirmance of a sentence unless it was manifestly unreasonable in light of the nature of the offense and the character of the offender. *See Singer v. State*, 674 N.E.2d 11 (Ind. Ct. App. 1996). The former App. R. 17(B) no longer provides the standard applicable to requests for appellate sentence revision. In 2003, the current Ind. Appellate Rule 7(B) was

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.

---

adopted, which allows this court to revise a sentence it finds inappropriate in light of the nature of the offense and the character of the offender. Because Hankins has not set forth any argument concerning the nature of the offense or his character, he has also waived appellate review of the appropriateness of his sentence under App. R. 7(B). *See Kimbrough v. State*, 979 N.E.2d 25 (Ind. 2012).