ATTORNEY FOR APPELLANT
P. Stephen Miller
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



No. 02S03-1205-CR-251

GERALD P. VANPATTEN,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Allen Superior Court, No. 02D04-0911-FA-69
The Honorable John F. Surbeck, Jr., Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 02A03-1103-CR-113

**May 2, 2013**

**David, Justice.**

When a competent adult patient visits a doctor and provides the physician with a medical history intending to aid in their diagnosis or treatment, we presume those statements are made truthfully because adults know that lying to one's doctor risks misdiagnosis or mistreatment. Accordingly, the Rules of Evidence generally allow medical professionals to provide substantive

testimony as to the statements their patients make in the course of providing their medical history—even though that testimony would ordinarily be excluded as hearsay. When the patient is a young child, however, it is not so easy to assume that he or she recognized the merit of providing a nurse or doctor with truthful information. Because of this, we require a more robust evidentiary foundation be laid before the same type of hearsay testimony is seen as reliable enough to be admitted.

Here, a defendant was convicted on two counts of child molestation and the only substantive evidence implicating him in those crimes was a forensic nurse examiner who testified about statements made by the alleged victim—a six-year-old child who, at the time of trial, had recanted. Based on our review of the trial record, however, there was an insufficient showing that the child victim in this case was motivated to provide truthful information to her nurse. Because of this, the nurse's testimony should not have been admitted as substantive evidence against the defendant and we therefore vacate his convictions with respect to those two counts of child molestation.

**Facts and Procedural History**

Gerald VanPatten is the biological father of S.D. During the summer of 2009, S.D.'s close friend, E.R., would often spend the night at S.D.'s house. The two girls, then around six years old, would sleep in the same bed. One morning in August of that summer, after a similar sleep-over, E.R. and S.D. told S.D.'s mother that VanPatten had molested them. E.R. ran back to her home and S.D.'s mother contacted her pediatrician, who directed her to the Department of Child Services.

S.D.'s mother took S.D. to a DCS office to be interviewed by a caseworker. DCS also contacted E.R.'s family and requested that E.R. be brought in for an interview as well. During the course of the interviews (which were videotaped), both girls stated that VanPatten had molested them—E.R. the previous evening and S.D. on prior occasions.

2

Both girls were then taken to the Fort Wayne Sexual Assault Treatment Center where they were examined by Joyce Moss, a forensic nurse examiner. Moss collected several biological samples from E.R. but not from S.D., because S.D. had allegedly been molested outside the window of time where such samples would still be viable.[1] Neither girl showed any signs of physical injury.

On November 17, 2009, the State charged VanPatten with three counts of class A felony child molesting[2] and one count of class C felony child molesting.[3] Two of the class A felony counts, Counts I and II, related to S.D., and one, Count III, related to E.R. Count IV, the class C felony count, related to S.D.

VanPatten hired counsel to represent him, but on December 13, 2010—five weeks before his trial date—VanPatten mailed a letter to the trial judge requesting a hearing in order to fire those attorneys in open court. In response, his attorneys filed a motion to withdraw, citing a breakdown in the attorney-client relationship that precluded any further representation. The trial court denied their motion to withdraw after a hearing on January 10, 2011.

At trial, E.R. testified in a manner generally consistent with the interviews she gave to DCS and Moss, alleging that VanPatten molested her on multiple occasions while she was spending the night with S.D. She also initially testified, on both direct and cross-examination, that she had never seen VanPatten molest anyone else. But later on cross-examination she

---

[1] At trial, a forensic scientist would testify that the analysis performed on these samples showed a mixture of biological profiles from which VanPatten could not be excluded. Additionally, a number of the samples included DNA containing Y chromosomes—in other words, DNA from a male.

[2] Ind. Code § 35-42-4-3(a) (2008).

[3] Ind. Code § 35-42-4-3(b) (2008).

testified that sometimes VanPatten's actions woke S.D. up, and when that happened "[h]e would do it to her." (Tr. at 212.)

S.D., however, recanted her previous allegations. She testified that she could not remember ever telling anyone that VanPatten did bad things to her, nor could she remember talking to E.R. about it. She remembered being interviewed by DCS, and had watched the videotape of the interview, but now claimed that what she said there was not true. She explicitly denied that VanPatten ever touched her "in a bad way or in a way that made [her] feel uncomfortable." (Tr. at 251.) The State sought to admit the videotape of the DCS interview to either refresh her memory or, barring that, as substantive evidence of VanPatten's conduct. VanPatten objected, and after discussion the trial court excluded the videotape.

The State then called Moss to testify as to what E.R. and S.D. told her during their forensic examinations, seeking to apply the hearsay exception found in Indiana Rule of Evidence 803(4) for statements made for the purpose of medical diagnosis or treatment. VanPatten objected, arguing that there was an insufficient foundation to support the use of the exception. The trial court overruled his objection and allowed Moss's testimony as substantive evidence.

On the stand, Moss referred to a written medical report summarizing the patient histories that she collected from the two girls, but she had no independent recollection of the specific interactions between herself and S.D. or E.R. With respect to S.D., Moss testified that her report said "[p]atient states he put his private on my private, on the inside. He put his mouth on my private and he put his finger in my private. Patient states white stuff came out of his private." (Tr. at 349.) The report did not identify the alleged perpetrator.

To impeach S.D.'s testimony that VanPatten had never molested her, the State called Danielle Goewert, the DCS employee who initially interviewed E.R. and S.D. VanPatten objected. The trial court permitted Goewert's testimony, though admonishing the jury that it was to be considered only for the purposes of assessing S.D.'s credibility—not as substantive proof of the crime. Goewert testified that in her interview, S.D. said she had been molested by

VanPatten and explicitly described acts similar in nature to those presented in Moss's patient history.

At the conclusion of the State's case in chief, VanPatten moved for judgment on the evidence with respect to the counts arising out of S.D.'s allegations. He argued that even with Moss's testimony, there was no substantive evidence identifying him as the perpetrator with respect to S.D. While Goewert testified that S.D. had identified VanPatten, that testimony was solely for impeachment purposes—and all of the biological evidence was collected from E.R., not S.D. The trial court denied his motion, finding a nexus between testimony from S.D.'s mother—that she did not want S.D. around VanPatten after E.R. and S.D. told her they had been molested—and Moss's testimony as to the patient history provided her by S.D.

The jury acquitted VanPatten of Count I, but convicted him of the remaining three charges. He received a sentence of forty years on each of the remaining class A felony counts, to be served consecutively, and a four-year sentence on the class C felony count, to be served concurrent to the second class A felony sentence.

VanPatten appealed the denial of his attorneys' motion to withdraw. He also appealed the admission of Moss's testimony, claiming it was improperly admitted under Indiana Evidence Rule 803(4), and claimed there was insufficient evidence to sustain his convictions for Counts II and IV. A divided panel of the Court of Appeals affirmed in an unpublished memorandum decision. VanPatten v. State, 2012 WL 456483 (Ind. Ct. App. Feb. 14, 2012).

All three judges concurred that the trial court was within his discretion to deny the motion to withdraw filed by VanPatten's attorneys, and did not do so arbitrarily or unreasonably. Id. at *3–4. The majority also affirmed VanPatten's convictions for molesting S.D., finding that Moss's testimony was properly admitted under Rule 803(4) and that there was sufficient evidence of his guilt. Id. at *6–7.

5

Judge Baker dissented with respect to Moss's testimony, believing it was not sufficiently reliable to be admissible and that without it the substantive evidence was insufficient to affirm VanPatten's convictions. Id. at *7–8 (Baker, J., concurring in part and dissenting in part). We granted transfer, thereby vacating the decision of the Court of Appeals. VanPatten v. State, 967 N.E.2d 1034 (Ind. 2012) (table); Ind. Appellate Rule 58(A).

Given the facts and circumstances of this particular case reflected in the record on appeal, we agree with the Court of Appeals that Judge Surbeck was within his discretion to deny VanPatten's attorneys' motion to withdraw and that he did not act arbitrarily or unreasonably to the extent VanPatten implies a denial of his right to fire the lawyers he hired.[4] Accordingly, we summarily affirm that portion of the Court of Appeals opinion, Ind. Appellate Rule 58(A)(2), and write here only on whether Moss's testimony was properly admitted and the impact of that determination on his convictions.

**Standard of Review**

The decision to admit or exclude evidence at trial is squarely within a trial court's discretion and we afford it great deference on appeal. Carpenter v. State, 786 N.E.2d 696, 702 (Ind. 2003). We will not reverse such a decision, often made in the context of heated testimony and argument, unless it is clearly contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law. Id. at 703.

---

[4] For that matter, although it has no bearing on our assessment of this issue, we commend VanPatten's counsel for their presentation of his defense. The record reflects a trial conducted with a high level of competence and advocacy on both sides of the aisle—and presided over by one of the finest trial judges in Indiana—that is particularly admirable in light of the apparent disputes between defense counsel and their client.

6

# I.     Admission of Moss's Testimony

A hearsay statement is one "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay statements are not admissible, except pursuant to certain exceptions within the Rules of Evidence. Ind. Evidence Rule 802.

One such exception generally permits statements made for the purpose of medical diagnosis or treatment to be admitted into evidence, even when the declarant is available. Ind. Evidence Rule 803(4). The statements must be "made by persons who are seeking medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Id. Rule 803(4)'s exception is grounded in a belief that the declarant's self-interest in obtaining proper medical treatment makes such a statement reliable enough for admission at trial—more simply put, Rule 803(4) reflects the idea that people are unlikely to lie to their doctors because doing so might jeopardize their opportunity to be made well. See White v. Illinois, 502 U.S. 346, 356 (1992) ("a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility").

This belief of reliability, though, necessitates a two-step analysis for admission under Rule 803(4): First, "is the declarant motivated to provide truthful information in order to promote diagnosis and treatment," and second, "is the content of the statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment." McClain v. State, 675 N.E.2d 329, 331 (Ind. 1996). Statements made by victims of sexual assault or molestation about the nature of the assault or abuse—even those identifying the perpetrator— generally satisfy the second prong of the analysis because they assist medical providers in recommending potential treatment for sexually transmitted disease, pregnancy testing, psychological counseling, and discharge instructions. See Palilonis v. State, 970 N.E.2d 713, 726–27 (Ind. Ct. App. 2012), trans. denied.

The first prong of the test, the declarant's motive to promote treatment or diagnosis, is equally crucial to a determination of reliability. McClain, 675 N.E.2d at 331. "[T]he declarant must subjectively believe that he was making the statement for the purpose of receiving medical diagnosis or treatment." Id. With most declarants, this is generally a simple matter: "[o]ften, for example where a patient consults with a physician, the declarant's desire to seek and receive treatment may be inferred from the circumstances." Id.

But in cases like the one here, where the declarant is a young child brought to the medical provider by a parent, we have acknowledged that such an inference may be less than obvious. See id. Such young children may not understand the nature of the examination, the function of the examiner, and may not necessarily make the necessary link between truthful responses and accurate medical treatment. In that circumstance, "there must be evidence that the declarant undersood the professional's role in order to trigger the motivation to provide truthful information." Id. (citing U.S. v. Barrett, 8 F.3d 1296, 1300 (8th Cir. 1993)). This evidence does not necessarily require testimony from the child-declarant; it may be received in the form of foundational testimony from the medical professional detailing the interaction between him or her and the declarant, how he or she explained his role to the declarant, and an affirmation that the declarant understood that role. Barrett, 8 F.3d at 1300. But whatever its source, this foundation must be present and sufficient.

Appellate review of this issue is necessarily case-specific and turns on the facts and circumstances of each case as they are reflected in its record. In McClain, for example, where a family therapist provided hearsay testimony under Rule 803(4) that a patient told her he had been molested, we held that this "requisite indicia of reliability" was missing. McClain, 675 N.E.2d at 331. "There [was] no evidence that the victim sought the therapist's help or that he believed he was receiving any treatment." Id. The declarant testified only that he knew his family therapist "was his 'counselor' and that he talked to her about what McClain did to him." Id. "Thus, the record [was] devoid of any evidence showing that the victim understood he was speaking to a trained professional for the purposes of obtaining diagnosis of, or providing treatment for, emotional or psychological injuries." Id.

And in <u>Cooper v. State</u>, 714 N.E.2d 689 (Ind. Ct. App. 1999), <u>trans denied</u>, a registered nurse provided hearsay testimony in the form of statements made to her by a child victim of sexual molestation during the course of a physical examination. <u>Id.</u> at 690. The Court of Appeals affirmed the admission of the testimony. <u>Id.</u> at 691. When assessing whether the first prong of the <u>McClain</u> test was satisfied, the court reviewed the foundational testimony provided by the nurse with respect to the interaction she has with children prior to those sorts of examinations—and the specific interaction she had with the child victim in that case. <u>Id.</u> at 692–694. A few critical items of that testimony stood out to the court.

With respect to the nurse's standard procedure, she testified that "we introduce ourselves to the child . . . and have the child get to know us." <u>Id.</u> at 692. "After you do the initial trying to get to know the child . . . generally I'll just take my time . . . just let them know who I am and who the doctor is . . . and then I'll start addressing the child, ask them if they know why they're in the emergency room." <u>Id.</u> The State specifically asked the nurse "When you're dealing with the child, you tell them who you are and what your job is?" <u>Id.</u> The nurse responded that "I usually tell them my name is Kim and I'll be their nurse and I'll be with them the whole time . . . [l]et them know what they are going to expect, what the doctor is going to do, and that it's okay for the doctor and nurse to take a look at them." <u>Id.</u>

With respect to the victim in <u>Cooper</u>, the nurse testified that she followed that same procedure, and that she let the victim know that "[h]er mom brought her in because of something, and if she's going to tell me what that something is when she feels comfortable to talk to me about it." <u>Id.</u> at 693. She said "I asked her if she knew why she was there in the emergency room, and I believe she thought she was going to get an exam. She needed to get examined, but she didn't know why." <u>Id.</u> at 694. Only after that introduction was made did the victim make substantive statements to the nurse as to the nature of the molestation and the perpetrator. <u>Id.</u>

Taken together, the court in <u>Cooper</u> held that the testimony provided a proper foundation for the admission of the nurse's testimony under Rule 803(4). The victim "knew that she was in

the emergency room for an examination by a physician because of the molestation by Cooper. [She] sufficiently understood the professional role of both the nurse and the doctor who examined her, thus triggering the motivation to provide truthful information." Id. at 694.

Later, in In re W.B., 772 N.E.2d 522 (Ind. Ct. App. 2002), two parents appealed the termination of their parental rights with respect to their two young children. Id. at 524. A factor in the termination decision was a finding by the trial court that the children were subjected to sexual and physical abuse by the parents—a finding based entirely on hearsay testimony provided by a therapist who relayed statements made to her by the children. Id. at 532. The Court of Appeals found that the testimony failed the first prong of the McClain test because the record was "devoid of any evidence . . . that the children, in making these statements, were 'motivated to provide truthful information in order to promote diagnosis and treatment.'" Id. at 533 (quoting McClain, 675 N.E.2d at 331). The court did not go into as much detail regarding the foundational testimony, but highlighted that it "clearly portrayed the young children as mentally and emotionally incompetent, and no doubt totally unaware of [the therapist's] professional purpose." Id.

Finally, in In re Paternity of H.R.M., 864 N.E.2d 442 (Ind. Ct. App. 2007), a father appealed a modification of his visitation rights that was based largely on hearsay testimony of sexual abuse provided by a clinical social worker. Id. at 444–45. The Court of Appeals reviewed the analysis in McClain, W.B., and Cooper, and by comparison found that "the record contain[ed] no indication that H.R.M. had the requisite motivation to tell the truth, as no evidence indicates that she knew [the social worker's] role or that she was being interviewed for the purpose of medical diagnosis." Id. at 447.

Though the social worker testified that the purpose of the interview was to assist the child with certain issues and formulate an individualized treatment plan, there was no evidence that the child knew she was there for that purpose. Id. And unlike in Cooper, the social worker's testimony "did not indicate that she explained to H.R.M. the purpose of the interview, or that H.R.M. knew she was at the interview to facilitate medical diagnosis and treatment." Id.

10

Accordingly, the Court of Appeals found that the social worker's testimony failed the first prong of the <u>McClain</u> test and was therefore improperly admitted. <u>Id.</u>

With that spectrum in mind, we look to the record at trial here to answer whether it reflects a sufficient foundation for Moss's testimony. First, Moss testified as to her usual procedure for introducing herself to patients:

> Q: How do you introduce yourself to children who are going to be examined? Do you have a procedure that you try to use all the time?
>
> A: I do. I usually introduce myself as Joyce, and I'm a nurse, just like the nurses at your doctor's office. It's my job to make sure that you're okay.
>
> * * *
>
> Q: Okay. So you ask general health issues and you also talk to them about why you're there to see them and provide treatment to them.
>
> A: Yes.
>
> * * *
>
> Q: And is that standard procedure in every child or patient you see?
>
> A: Yes it is.
>
> Q: Did you do all these procedures, would you have done all the same procedures with [E.R.]?
>
> A: Yes.
>
> Q: During the history portion of [E.R.] did you specifically ask her questions related to why you were going to be conducting your examination?
>
> A: Yes.

(Tr. at 322–24.)  At that point, the prosecutor asked Moss to relay the patient history provided to her by E.R., and VanPatten objected.  (Tr. at 324.)  VanPatten's counsel was permitted to ask a few preliminary questions:

> Q:  Good afternoon, just briefly, you told Ms. Speith what you generally tell children.  Do you remember exactly what you told [E.R.] when she came in?
>
> A:  I would have asked her if she knew why she was there.
>
> Q:  Okay.  Now you remember me taking your deposition last October, right?
>
> A:  Yes.
>
> Q:  Do you remember telling me at that time that you didn't have any independent recollection of your interview with [E.R.] or [S.D.] other than what's in your report?  Do you need me to repeat that question?
>
> A:  Yes.
>
> Q:  I asked you at the deposition if you had any independent recollection of your interviews with either [E.R.] or [S.D.].  Remember me asking you that question?
>
> A:  Yes.
>
> Q:  And you told me no, you did not.  That other than what's in your report you have no independent recollection.  Remember saying that?
>
> A:  Yes.
>
> Q:  Okay.  And it's true that your conversation upon meeting [E.R.] is not in your report, correct?
>
> A:  That is correct.
>
> Q:  So are you speaking in generalities, in other words, it's your habit to say these things to a child or are you specifically now, five months later, three months later, all of a sudden you remember exactly what you told [E.R.] ?

A: It is habit.

Q: So you don't know for sure what you told [E.R.]?

A: Correct.

* * *

Q: Okay. And I think you said earlier that you would have told her, typically what you say, my job is to see that you're okay.

A: Correct.

Q: Do you remember telling either [E.R.] or [S.D.] specifically, I'm going to ask you some questions and it's important for you to tell me the truth because I'm going to provide you medical care?

A: I would not have said that to them.

(Tr. at 325–27.) VanPatten reiterated his objection to Moss's substantive testimony, arguing that there was an insufficient foundation of reliability with respect to the evidence of E.R. and S.D.'s motivation to be truthful. That State responded that "[w]e've all been to doctors, we've all been to hospitals and we talk to every physician or nurse who's ever treated us, when they ask us why we're there for, never says that it's important to be truthful because we're going to be providing you medical treatment based on what you say." (Tr. at 328.) "She's at a medical facility, it looks like a medical facility, she's dressed as a nurse, it's a six year old child who clearly understands doctors office (inaudible word)." (Tr. at 328.) The trial court overruled VanPatten's objection.

Later, Moss testified as to her interview with S.D.:

Q: Okay. So the first time you met [S.D.] is when she came to your office and do you recall approximately what time she got to your office?

A: May I refer to my notes?

Q: Sure.

13

A:  She arrived right at about 8:40 p.m.

Q:  And did she come alone or with somebody else?

A:  She came with her mother.

Q:  Did you follow the same procedure with [S.D.] that you did with [E.R.] as far as introducing yourself?

A:  Yes I did.

Q:  Are you still wearing scrubs?

A:  Yes.

Q:  The same or different scrubs?

A:  The same.

Q:  Are you still in the same medical office building or medical building?

A:  Yes.

* * *

Q:  Okay.  So you introduce yourself to [S.D.], correct?

A:  Yes.

Q:  Then what happened after you introduced yourself to [S.D.]?

A:  I would have then collected a medical history as well as had the consent signed.

Q:  Okay.  And her mother signed consent authorizing an examination, is that correct?

A:  Yes, that is correct.

Q:  Okay.  And then is that when you take the child back to the room without their parents.

A:  Correct.

Q:  When you got [S.D.], was she also six?

A: Yes.

Q: When you got [S.D.] back into the examination room, did you then talk to her about, did you get a continuing medical history from her so that you knew what had happened?

A: Yes I did.

Q: And did you get the statement from [S.D.] herself?

A: Yes I did.

Q: What did [S.D.] tell you about what had happened and why she was there for a medical exam?

(Tr. at 344–46.) VanPatten objected again, and was again permitted to ask a few preliminary questions:

Q: Ms. Moss, again, without trying to be too redundant, but again, no independent recollection outside of what is in your report as to this specific interview with [S.D.]?

A: Correct.

Q: Okay. And you don't remember exactly what you told her prior to interviewing her?

A: No.

Q: Other than what you normally tell children.

A: Correct.

(Tr. at 347.) VanPatten renewed his hearsay objection, and the trial court again overruled it.

VanPatten highlights that Moss had no specific memory of what she said to S.D. and E.R. prior to interviewing them, and that there was no testimony to establish either girl knew what telling the truth meant, much less the importance of telling the truth in a medical examination, (Appellant's Br. at 20–21.) The State argues as it did at trial: that this record here is similar to Cooper, and points to the examination taking place in a building that looked like a medical clinic,

15

equipped with an exam table and equipment like a doctor's office, and that Moss was wearing scrubs and introduced herself as a nurse whose job it was to make sure that the girls were okay. (Appellee's Br. at 15.)

Were S.D. and E.R. older, certainly the State is correct that the appearance of the building, the exam room, and Moss's scrubs and job title would probably be sufficient circumstances from which to infer that the two girls desired to seek medical treatment and were thus motivated to speak truthfully. But as we said in McClain, with young victims, "that inference is not obvious," and "there must be evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information." McClain, 675 N.E.2d at 331. In fact, as the witness in Cooper testified, these "obvious" signs may sometimes be an impediment to a motivation to tell the truth because "[m]ost kids even though you try and set them at ease, they still think they did something wrong or that because they're in [the emergency room] they are going to get a shot, just get scared." Cooper, 714 N.E.2d at 693–94.

In fact, the precise point of McClain is that courts cannot simply assume that what is obvious to a competent adult—that they are in a medical facility seeking medical treatment from a medical professional—is obvious to a child. As VanPatten's counsel argued at trial in support of his objection, "the distinguishing feature here is we're dealing with a six year old child, that the six year old child doesn't comprehend the same way that adults do. We as adults of course know that it's important for a medical professional to know the truth. I don't think you can make that assumption when dealing with a six year old child." (Tr. at 329.)

Instead, the question before us is whether the record reflects that the child adequately understood the role of the medical professional and the purpose of the visit in order for us to infer that the child was motivated to speak truthfully. And in that regard, we find this case farther from Cooper's clarity than the State suggests.

16

As we read it, the collective impression left from the testimony at trial is murky at best, beginning with the purpose of the examination. The girls were examined by Moss only after being extensively interviewed at DCS, muddying the issue of whether the underlying motivation even from their parents was to seek medical treatment for their children or to assist the police in their investigation. And Moss admitted that she observed the DCS interview before she met the girls, raising the concern that her questioning may have steered the answers to support the allegations brought up in the interview. This is a concern we cannot fully dismiss based on the trial record.

Furthermore, there is no testimony from E.R. or S.D. that either understood Moss's professional role, or the role of nurses or doctors in general. Nor is there testimony from either girl, or their parents, concerning past experience with medical facilities or medical providers from which we could reasonably infer that the girl knew why she was being examined at the Fort Wayne Sexual Assault Center.

In fact, the only statements relevant to the first prong of the McClain test are Moss's statement that she tells children "[i]t's my job to make sure that you're okay," and her affirmative response to the question "[s]o you ask general health issues and you also talk to them about why you're there to see them and provide treatment to them?" And even though Moss testified that she goes through this same procedure with every child, her subsequent testimony that she has no actual recollection of her conversations with E.R. and S.D.—and also that those conversations were not recorded or summarized in the report she used to refresh her memory— undercuts our ability to infer that E.R. and S.D. were motivated to respond truthfully to her questions because they understood her professional role.

Nor can we draw this inference just from the fact that Moss had performed well over a hundred such forensic examinations on children, because every child will be different at that age. While this background certainly lends support to her assertion that her interaction with E.R. and S.D. occurred in a similar fashion, it does not necessarily indicate that these particular children, in these particular examinations, understood the nature of the process. Each child is different,

17

and it would be no more appropriate to treat them all the same with respect to this inference than it would be to treat them the same as we treat adults.

We do not intend for this evidentiary foundation to present an insurmountable hurdle, nor do we seek to dictate trial testimony. But here, for example, a few simple questions asked of E.R. and S.D. would have helped: "Have you been to a doctor's office before?" "Have you been seen by a nurse before?" "Do you know what nurses do?" "What do they do?" "Do you know the difference between the truth and a lie?" "Do you tell nurses and doctors the truth?" "Do you know why you tell the nurses and doctors the truth?" "Did you know why you were seeing Nurse Moss?" Firm responses to questions like these would go a long way in supporting the inference that E.R. and S.D. were motivated to tell Moss the truth when she examined them.

Likewise, a few more directed questions for Moss would have been helpful (although given her lack of precise knowledge about her interactions with E.R. and S.D., we concede that these would have been difficult in this particular case): "Did you explain the purpose of the examination to the girls?" "How so?" "Did you ask if they understood the purpose of the examination?" "Did you ask if they had been seen by a nurse before?" "Did you explain how important it was that they tell you the truth?" "How did they respond?" These sorts of questions—and solid responses—reflected in the record would certainly help a reviewing court confirm that the hearsay testimony sought to be admitted was sufficiently reliable.

Along those same lines, a few simple questions asked of E.R. and S.D.—or their parents—could have clarified the purpose of the visit in the first place. "Why were you seeing Nurse Moss?" "Did the police ask you to take your daughter to the Sexual Assault Treatment Center?" "Why did you take your daughter there?" "Why not take her to a hospital before taking her to DCS?" This sort of evidentiary foundation would certainly ameliorate our concern that the visit was intended to obtain evidence as part of a law enforcement investigation.

18

But no such foundation is here in this record.  The testimony does not tell us at all what Moss said to E.R. and S.D., how they responded, and whether they understood what was going on.  And in fact, Moss expressly said that she would *not* have explained to the girls how important it is that they tell her the truth.  Simply put, there is no "evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information."  McClain, 675 N.E.2d at 331.  This is not to say that Moss did not necessarily discuss these things with S.D. and E.R., or that her work as a sexual assault examiner was somehow deficient.  But without that firm indication of reliability *in the record*, we have no choice on appellate review but to conclude that the statements made to her by S.D. and E.R. should not have been admitted under the hearsay exception found in Indiana Rule of Evidence 803(4), and it was an abuse of the trial court's discretion to do so.

## II.      Impact of Moss's Testimony

That Moss's testimony was improperly admitted does not end the matter, though.  "[E]rrors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party."  McClain, 675 N.E.2d at 331; see also Ind. Trial Rule 61.  "In determining whether error in the introduction of evidence affected the defendant's substantial rights, this Court must assess the probable impact of the evidence upon the jury."  McClain, 675 N.E.2d at 331.  "Admission of hearsay evidence is not grounds for reversal where it is merely cumulative of other evidence admitted."  Id. at 331–32.

VanPatten does not challenge the admission of this testimony with respect to E.R.'s out-of-court statements, or its impact on those criminal charges—nor could he.  E.R. testified at trial in a way that mirrored the hearsay testimony later provided by Moss, making Moss's testimony merely cumulative and at most harmless error.  Cf. id. at 331 ("In the present case, the child victim testified at trial, and was subject to cross-examination, regarding the acts of molestation and the surrounding circumstances of the incident.  Thus, the declarant's statements as reported by the therapist, insofar as they bore on guilt or innocence or the declarant's apprehension of the

defendant, merely repeated the declarant's statements made on the stand.") Thus, the error is not grounds for reversal with respect to VanPatten's conviction on that count.

The same cannot be said for Moss's testimony relaying S.D.'s statements. Given that S.D. recanted her allegations on the stand, the only substantive testimony as to VanPatten's guilt with respect to those particular charges was Moss's testimony. Though Goewert provided similar testimony, it was solely for impeachment purposes and could not be used as substantive evidence of VanPatten's guilt. No biological samples were collected from S.D. that might otherwise link VanPatten to her. And although E.R. did say that when VanPatten molested her, it would sometimes wake S.D. up, and then "he would do it to her," that statement was elicited on cross-examination—after she repeatedly testified at trial that she never saw VanPatten molest anyone else.

Accordingly, we are left with but one conclusion: the probable impact of Moss's testimony on the jury—indeed the only conceivable impact—was to convince the jury of VanPatten's guilt. Nothing else could have done so. We therefore must vacate VanPatten's convictions for molesting S.D.

Without Moss's testimony, the evidence against VanPatten was insufficient to sustain his convictions for molesting S.D. However, the insufficiency only exists because of appellate exclusion, and Double Jeopardy considerations do not bar retrial on those same charges. See Lockhart v. Nelson, 488 U.S. 33, 38–42 (1988); accord Irons v. State, 272 Ind. 287, 290–91, 397 N.E.2d 603, 605–06 (1979); Mulry v. State, 399 N.E.2d 413, 418–19 (Ind. Ct. App. 1980).[5]

---

[5] On February 20, 2013, the U.S. Supreme Court decided Evans v. Michigan, in which it held that Double Jeopardy protections barred the retrial of a criminal defendant who was granted a directed verdict of acquittal "because the prosecution had failed to prove an 'element' of the offense that, in actuality, it did

**Conclusion**

We therefore reverse and remand for a new trial on Counts II and IV.


Dickson, C.J., and Rucker, J., concur.
Massa, J., concurs in result with separate opinion in which Rush, J., concurs.

---

not have to prove." ___ U.S. ___, 2013 WL 610197, *4 (Feb. 20, 2013).  Nothing in Evans so limits the State here, should it wish to retry VanPatten.

**Massa, Justice, concurring in result.**

Although I agree with the majority's analysis of S.D.'s statements to Moss under our Rules of Evidence, I write separately because I believe the admissibility of such evidence can and should be evaluated pursuant to the Protected Person Statute, Indiana Code § 35-37-4-6 (2008 & Supp. 2012), not Rule 803(4). Child victim hearsay presents a unique evidentiary problem in prosecutions for abuse and molestation. In cases where the child is unavailable to testify, these statements are frequently the strongest evidence of a defendant's guilt. Deborah Paruch, Silencing the Victims in Child Sexual Abuse Prosecutions: The Confrontation Clause and Children's Hearsay Statements Before and After Michigan v. Bryant, 28 Touro L. Rev. 85, 114–15 (2012). Even when the child does testify, the hearsay statements—made soon after the offense was committed, while it was still a fresh memory—are often more detailed and thus more convincing than live testimony. Id.

Under traditional hearsay rules, these statements are often inadmissible. However, in light of challenges unique to the prosecution of adults who prey on the most vulnerable, courts and legislatures have generally agreed that certain out-of-court statements should be admitted if they are sufficiently reliable. See Michael H. Graham, The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship, 72 Minn. L. Rev. 523, 529 (1988). To that end, thirty-two states, including Indiana, have child hearsay statutes that apply only in prosecutions for certain serious offenses and only to statements describing the charged offense that are not otherwise admissible.[1] These statutes vary somewhat in their

---

[1] Ala. Code §§ 15-25-31 & -32 (2011 & Supp. 2012); Alaska Stat. § 12.40.110 (2012); Ariz. Rev. Stat. Ann. § 13-1416 (2010); Ark. R. Evid. 803(25); Cal. Evid. Code § 1360 (Supp. 2013); Colo. Rev. Stat. § 13-25-129 (2012); Del. Code Ann. tit. 11, § 3513 (2007); Fla. Stat. § 90.803(23) (2011); Ga. Code Ann. § 24-8-820 (2013); Haw. R. Evid. 804(b)(6); 725 Ill. Comp. Stat. § 5/115-10 (2008 & Supp. 2012); Ind. Code § 35-37-4-6; Kan. Stat. Ann. § 60-460(dd) (2005 & Supp. 2012); Md. Code Ann., Crim. Proc. § 11-304 (2008 & Supp. 2012); Mass. Gen. Laws ch. 233, § 81 (2000); Mass. R. Evid. § 804(b)(8); Mich. R. Evid. 803A; Minn. Stat. § 595.02(3) (2010); Miss. Code Ann. § 13-1-403 (2012); Mo. Rev. Stat. § 491.075 (2011 & Supp. 2013); Mont. Code Ann. § 46-16-220 (2011); Nev. Rev. Stat. § 51.385 (2004);

operation; some apply only to out-of-court statements made by the child victim of the charged offense,[2] but others apply to child witnesses as well as victims.[3]  They frequently require the court to evaluate the reliability of the hearsay in a hearing on the record before ruling on its admissibility.[4]  Some require the declarant to testify,[5] but others permit the hearsay to be admitted even if the declarant is found unavailable, so long as there is evidence to corroborate

---

N.J. R. Evid. 803(27); N.D. R. Evid. 803(24); Ohio R. Evid. 807; Okla. Stat. tit. 12, § 2803.1 (2009); Or. Rev. Stat. § 40.460(18a) (2013); 42 Pa. Cons. Stat. § 5985.1 (2000 & Supp. 2012); S.D. Codified Laws § 19-16-38 (2013); Tex. Crim. Proc. Code Ann. art. 38.072 (2005 & Supp. 2012); Tex. Gov't Code Ann. § 2001.122 (2008); Utah R. Crim. P. 15.5; Vt. R. Evid. 804A; Wash. Rev. Code § 9A.44.120 (2009).

[2] See, e.g., Cal. Evid. Code § 1360; Fla. Stat. § 90.803(23); 725 Ill. Comp. Stat. § 5/115-10; Ind. Code § 35-37-4-6; Kan. Stat. Ann. § 60-460(dd); Md. Code Ann., Crim. Proc. § 11-304; Mass. Gen. Laws ch. 233, § 81; Mass. R. Evid. § 804(b)(8); Mich. R. Evid. 803A; Minn. Stat. § 595.02(3); Nev. Rev. Stat. § 51.385; N.J. R. Evid. 803(c)(27); Ohio R. Evid. 807; Okla. Stat. tit. 12, § 2803.1; Or. Rev. Stat. § 40.460(18a); Tex. Crim. Proc. Code Ann. art. 38.072; Tex. Gov't Code Ann. § 2001.122; Vt. R. Evid. 804A; Wash. Rev. Code § 9A.44.120.

Some scholars argue these statutes are overly restrictive, preventing the use of child witness hearsay that would be both reliable and helpful to the trier of fact.  See, e.g., Jean Montoya, Child Hearsay Statutes:  At Once Over-Inclusive and Under-Inclusive, 5 Psychol. Pub. Pol'y & L. 304, 316 (1999).

[3] See, e.g., Ala. Code §§ 15-25-31, -32; Ariz. Rev. Stat. Ann. § 13-1416; Colo. Rev. Stat. § 13-25-129; Del. Code Ann. tit. 11, § 3513; Miss. Code Ann. § 13-1-403; Mo. Rev. Stat. § 491.075; Mont. Code Ann. § 46-16-220; N.D. R. Evid. 803(24); 42 Pa. Cons. Stat. § 5985.1; S.D. Codified Laws § 19-16-38; Utah R. Crim. P. 15.5.

[4] But see Ala. Code §§ 15-25-31, -32; Alaska Stat. § 12.40.110; Del. Code Ann. tit. 11, § 3513; Ga. Code Ann. § 24-8-820; Haw. R. Evid. 804(b)(6); Mich. R. Evid. 803A; Mont. Code Ann. § 46-16-220 (all omitting hearing requirement).

[5] Alaska Stat. § 12.40.110 (requiring declarant testify either at trial or in a grand jury proceeding); Ga. Code Ann. § 24-8-820 (requiring declarant testify and hearsay statement have "sufficient indicia of reliability"); Ind. Code § 35-37-4-6 (requiring declarant be available for cross-examination either when statement was made or at credibility hearing); Mich. R. Evid. 803A (admitting only statements that corroborate "testimony given by the declarant during the same proceeding"); Tex. Gov't Code Ann. § 2001.122 (requiring declarant testify); Vt. R. Evid. 804A (requiring declarant testify and statement have "substantial indicia of trustworthiness").

the hearsay,[6] and a few apply only when the declarant does *not* testify.[7]  Only a few have been found constitutionally infirm,[8] and several have been challenged and upheld.[9]

---

[6] See, e.g., Ariz. Rev. Stat. Ann. § 13-1416; Cal. Evid. Code § 1360; Colo. Rev. Stat. § 13-25-129; Fla. Stat. § 90.803(23); 725 Ill. Comp. Stat. § 5/115-10; Md. Code Ann., Crim. Proc. § 11-304; Mass. Gen. Laws ch. 233, § 81; Mass. R. Evid. § 804(b)(8); Minn. Stat. § 595.02(3); Miss. Code Ann. § 13-1-403; Mo. Rev. Stat. § 491.075; N.J. R. Evid. 803(27); N.D. R. Evid. 803(24); Okla. Stat. tit. 12, § 2803.1; S.D. Codified Laws § 19-16-38; but see Ala. Code §§ 15-25-31, -32 (omitting corroboration requirement); Del. Code Ann. tit. 11, § 3513 (requiring "particularized guarantees of trustworthiness" but not corroboration); Mont. Code Ann. § 46-16-220 (stating only that court must consider existence of corroboration as a factor in determining admissibility); Nev. Rev. Stat. § 51.385 (omitting corroboration requirement); Ohio Evid. R. 807 (requiring both unavailability and corroboration); Or. Rev. Stat. § 40.460(18a); 42 Pa. Cons. Stat. § 5985.1; Utah R. Crim. P. 15.5 (all omitting corroboration requirement).

[7] Haw. R. Evid. 804(b)(6) (requiring declarant be unavailable to testify); Kan. Stat. Ann. § 60-460(dd) (requiring declarant be disqualified or unavailable to testify).

[8] See, e.g., Styron v. State, 34 So. 3d 724, 731 (Ala. Crim. App. 2009) (recognizing Crawford partially abrogated Ala. Code § 15-25-32); People v. Moreno, 160 P.3d 242, 246 (Colo. 2007) ("To the extent that the statute allows for the admission of out-of-court testimonial statements without the defendant being afforded an opportunity to cross-examine the declarant, it is now clear that [Colo. Rev. Stat. § 13-25-129] violates the confrontation guaranty of the Sixth Amendment."); Hall v. State, 539 So. 2d 1338, 1346 (Miss. 1989) (invalidating Miss. Code Ann. § 13-1-403 as an impermissible legislative intrusion on the judicial power to make rules governing hearsay).

   In this case, of course, there is no Confrontation Clause issue, as S.D. took the stand and testified. (Tr. at 220–253.)  And although the issue is not before us today, I note that even if this Court found a conflict between the Protected Person Statute and our Rules of Evidence, we could—as we have done before—assent to the statute.  See Harrison v. State, 644 N.E.2d 1243, 1251 n. 14 (Ind. 1995) (noting that a statute in conflict with the Rules of Evidence is invalid); Humbert v. Smith, 664 N.E.2d 356, 356 (Ind. 1996) (citing Harrison but nevertheless assenting to a statute relating to the admission of blood tests in paternity cases that conflicted with the Rules of Evidence).  In my view, however, there is no such conflict.  See Ind. Evidence Rule 802 ("Hearsay is not admissible except as provided *by law or* by these rules." (emphasis added)).

[9] See, e.g., Myatt v. Hannigan, 910 F.2d 680, 685 (10th Cir. 1990) (upholding Kan. Stat. Ann. § 60-460(dd)); Thomas v. State, 725 A.2d 424, 429 (Del. 1999) (upholding Del. Code Ann. tit. 11, § 3513); Glendening v. State, 536 So. 2d 212, 221 (Fla. 1988) (upholding Fla. Stat. § 90.803(23)); Bunn v. State, 728 S.E.2d 569, 575 (Ga. 2012) (upholding Ga. Code Ann. § 24-8-820); People v. Priola, 561 N.E.2d 82, 95 (Ill. App. Ct. 1990) (upholding 725 Ill. Comp. Stat. § 5/115-10); Holland v. State, 802 S.W.2d 696, 701 (Tex. Crim. App. 1991) (upholding Tex. Crim. Proc. Code Ann. art. 38.072).

Some states admit these statements under Rule 803(4)[10] or pursuant to a residual exception like that contained in Federal Rule of Evidence 807.[11] In Indiana, we have no residual exception, so the latter option is not available to us, and because we have the Protected Person Statute, we need not avail ourselves of the former.[12]

The Protected Person Statute applies to certain types of criminal offenses, including the sex crimes VanPatten was charged with here. Ind. Code § 35-37-4-6(a)(1). S.D. is a "protected person" as defined by the statute, because she "is less than fourteen (14) years of age." Ind. Code § 35-37-4-6(c)(1). Her statement to Moss concerned "an act that is a material element of [the] offense . . . allegedly committed against [her]." Ind. Code § 35-37-4-6(d)(2). Thus, under the terms of the Protected Person Statute, that statement would be admissible at trial if the requirements of subsection (e) are met:

(1) The court finds, in a hearing:

---

[10] See, e.g., State v. Nelson, 953 P.2d 650, 656 (Idaho Ct. App. 1998) (upholding admission of ten-year-old victim's statements to an emergency room doctor); State v. James, 849 So. 2d 574, 585 (La. Ct. App. 2003) (upholding admission of five-year-old victim's statements to doctor as part of routine interview); State v. Vaught, 682 N.W.2d 284, 290 (Neb. 2004) (upholding admission of four-year-old victim's statements to doctor identifying perpetrator); State v. Munroe, 20 A.3d 871, 880 (N.H. 2011) (upholding admission of seven-year-old victim's statements to doctor); State v. Massengill, 62 P.3d 354, 362 (N.M. Ct. App. 2002) (upholding admission of two-year-old victim's statements to nurse and doctor); People v. Cole, 807 N.Y.S.2d 166, 172 (N.Y. App. Div. 2005) (upholding admission of six-year-old victim's statements to emergency room doctor because they did not identify the perpetrator); State v. Shepherd, 575 S.E.2d 776, 779 (N.C. Ct. App. 2003) (upholding admission of seven-year-old victim's statements to doctor).

[11] See, e.g., State v. Sorenson, 421 N.W.2d 77, 86 (Wis. 1988) (upholding admission of seven-year-old victim's statements to social worker); see also Graham, supra, at 530–31.

[12] Admittedly, we have done so in the past. See, e.g., McClain v. State, 675 N.E.2d 329, 331 (Ind. 1996) (establishing two-prong test for admissibility of child victim hearsay under Rule 803(4) but finding the requisite indicia of reliability missing from the record); Cooper v. State, 714 N.E.2d 689, 692–93 (Ind. Ct. App. 1999), trans. denied (applying McClain test to admit a child victim's statements to a nurse during a physical examination).

4

> (A) conducted outside the presence of the jury; and
>
> (B) attended by the protected person in person or by using closed circuit television testimony as described in section 8(f) and 8(g) of this chapter;
>
> that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability.
>
> (2) The protected person:
>
> > (A) testifies at the trial; or
> >
> > (B) is found by the court to be unavailable as a witness for one (1) of the following reasons:
> >
> > > (i) From the testimony of a psychiatrist, physician, or psychologist, and other evidence, if any, the court finds that the protected person's testifying in the physical presence of the defendant will cause the protected person to suffer serious emotional distress such that the protected person cannot reasonably communicate.
> > >
> > > (ii) The protected person cannot participate in the trial for medical reasons.
> > >
> > > (iii) The court has determined that the protected person is incapable of understanding the nature and obligation of an oath.

Ind. Code § 35-37-4-6(e). Upon remand, if the prosecutor seeks to admit Moss's statements pursuant to the Protected Person Statute rather than Rule 803(4), the court will have to conduct a hearing to determine whether those statements have "sufficient indications of reliability." S.D. will also have to testify at trial, or be found to be unavailable. If she is found unavailable, her statements may only be admitted if she was available for cross-examination at the reliability hearing. Ind. Code § 35-37-4-6(f)(1).

Of course, the declarant's subjective belief may still be a factor in the court's determination of reliability. But where we have a statute that permits the trial court to consider the totality of the circumstances, it need not be the *only* factor. Therefore, I concur in result.

**Rush, J., concurs.**

5