## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 11 2016, 7:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Bellin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jason D. Penninger, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 11, 2016 <br><br> Court of Appeals Case No. 20A04-1509-CR-1545 <br><br> Appeal from the Elkhart Superior Court <br><br> The Honorable Teresa L. Cataldo, Judge <br><br> Trial Court Cause No. 20D03-1411-FA-27 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Jason D. Penninger (Penninger), appeals his conviction for child molesting as a Class A felony, Ind. Code § 35-42-4-3(a)(1) (2012); and child molesting as a Class C felony, I.C. § 35-42-4-3(b) (2012).

We affirm.

## ISSUES

Penninger raises two issues on appeal, which we restate as follows:

(1) Whether the State presented sufficient evidence to support Penninger's conviction for child molesting as a Class A felony; and

(2) Whether the trial court abused its discretion by admitting hearsay statements into evidence.

## FACTS AND PROCEDURAL HISTORY

In January of 2013, A.G. (Mother) met and began dating one of her co-workers, Penninger. At the time, Mother lived in a small, two-bedroom apartment in Goshen, Elkhart County, Indiana, with her five-year-old daughter, N.G., and her mother/N.G.'s grandmother, L.S. (Grandmother). Mother and Grandmother were employed by the same company in Goshen; Grandmother worked first shift (6:00 a.m. to 2:30 p.m.), and Mother worked second shift (3:00 p.m. to 11:30 p.m.). During the week, Mother would pick N.G. up from kindergarten on her way to work and drop N.G. off with Grandmother. Grandmother would then take N.G. home to play with her, feed her, bathe her, and put her to bed.

Penninger worked second shift when he met Mother, but he was transferred to first shift shortly thereafter. Between January and March of 2013, Penninger frequently spent time at Mother's apartment, and N.G. got along well with Penninger. In fact, Mother and Penninger rarely spent time alone together because they were usually accompanied by N.G. Even when Mother was not there, Penninger had a key to the apartment and would sometimes stop over to eat dinner or watch television with Grandmother and N.G. while he waited for Mother to get home. Although Mother denied that she was involved in a sexual relationship with Penninger, both Mother and Penninger stated that Penninger frequently stayed overnight during those few months, and he slept in Mother's bed. Because N.G. shared a bedroom with Mother, on the nights that Penninger spent the night, N.G. slept in Grandmother's room.

At some point in mid-to-late March 2013, Mother was at work, and Grandmother was babysitting N.G. On this night, Grandmother put N.G. to bed, in N.G.'s own bed in Mother's room, between 9:00 p.m. and 9:30 p.m. Before tucking herself into bed, Grandmother turned on the hallway light as a nightlight for N.G., and Grandmother left her own bedroom door open about four or five inches in case N.G. needed her. After Grandmother fell asleep, she heard the thud of footsteps in the hallway and, still half-asleep, assumed that Mother had arrived home from work. However, when Grandmother subsequently heard blood-curdling screams and the sound of N.G. crying, Grandmother looked at her clock and realized that it was still too early for Mother to be home from work. At that point, Grandmother observed that her

bedroom door, which she had left ajar, was shut. Grandmother walked out to the living room and saw N.G. lying face down on the couch. On the floor next to her was Penninger, who had arrived at the apartment unbeknownst to Grandmother. Penninger was patting N.G.'s back in an apparent effort to soothe her. When Grandmother asked N.G. what was wrong, Penninger answered that N.G. was crying because she wanted Mother. Both Penninger and N.G. were fully clothed—with N.G. wearing pajamas consisting of shorts with an elastic waistband and a t-shirt, and Grandmother did not witness any inappropriate conduct. However, Grandmother stated that she had never before heard N.G. scream or cry like that. Grandmother took N.G. to Grandmother's bedroom, but N.G. refused to tell Grandmother why she was so upset. Grandmother attempted to console N.G., who continued to cry until she fell asleep.

[7] On April 3, 2013, N.G. disclosed to her aunt, C.S. (Aunt), that she had been touched inappropriately. Using dolls to demonstrate what had happened, N.G. "put one of the heads down by the private areas." (Tr. p. 244). Although N.G. indicated that she was scared that Mother "was going to hate her," Aunt convinced N.G. to tell Mother what had happened. (Tr. p. 239). The next morning, April 4, 2013, Mother contacted the police and reported that N.G. had been molested. Later that day, Sara Atkinson, a licensed social worker, conducted a forensic interview with N.G. During the interview, N.G. was "very articulate," and, using age-appropriate terminology, described acts of sexual molestation to which she had been subjected. (Tr. p. 394).

[8] On April 19, 2013, N.G. received a medical evaluation at the Fort Wayne Sexual Assault Treatment Center. A board-certified sexual assault nurse examiner, Leslie Cook (Nurse Cook), examined N.G. In order to formulate a diagnosis and treatment plan, Nurse Cook questioned N.G. about her reported molestation. N.G. reported

> that Jason [*i.e.*, Penninger] touched her privacy with his hand and . . . she indicated that her privacy was where she goes pee from. She went on to say that it was on her skin, that he touched on the inside, and that it made her privacy feel like a needle. She also stated that she saw some blood in her underwear afterwards.

(Tr. p. 347). N.G. further stated

> that [Penninger] had pulled his pee-pee out of his pants and had asked her to touch it. And she indicated to me that she did not. And when I asked her if these events happened one time or more than one time, she indicated to me more than one time.

(Tr. p. 348). When Nurse Cook conducted a physical examination, she found no injuries to N.G.'s internal structures—*i.e.*, "the labia minora, the urethra, the hymen, the vagina, the clitoris, the clitoral hood." (Tr. p. 360). However, Nurse Cook explained that the lack of documented injuries is not abnormal in light of the fact that the type of sex acts involved (*i.e.*, the use of fingers) "don't always cause injury." (Tr. p. 359). Furthermore, the tissue comprising these structures is "more of a mucous membrane" which has rapid healing capabilities. Thus, Nurse Cook would not necessarily expect to see any injuries unless the sex act occurred within the seventy-two hours preceding the

examination. Nurse Cook also observed that N.G.'s hymen was "unestrogenized." (Tr. p. 355). According to Nurse Cook, the lack of estrogen in a prepubescent hymen causes it to be "extremely painful to touch." (Tr. p. 357).

[9] As a result of N.G.'s allegations, the Elkhart County Sheriff's Department conducted an interview with Penninger. Penninger denied that he had ever touched N.G. inappropriately, specifically claiming that he does not "have time to do this sort of thing." (Tr. p. 121). When confronted with the incident in which Grandmother woke up to a hysterical N.G., Penninger first explained that he had been in the living room and that he and Grandmother had both gone into N.G.'s bedroom to comfort her when they heard her crying. Later in the interview, the detective indicated that it had been reported that N.G. had actually been in the living room with Penninger when she was crying. At that point, Penninger altered his version of events and stated that N.G. had come out of her bedroom crying, and he was in the living room with her trying to console her and ascertain the cause of her distress.

[10] On November 20, 2014, the State filed an Information, charging Penninger with Count I, child molesting as a Class A felony; and Count II, child molesting as a Class C felony. On July 27 through 29, 2015, the trial court conducted a jury trial. N.G., who was eight years old at the time of trial, testified that Penninger had touched her "no-no spot" with "[h]is hand" "[u]nder" her clothing when she was five years old. (Tr. p. 418). N.G. indicated that he had touched "[b]oth" the inside and outside of her "no-no spot." (Tr. p. 419).

When asked to define her "no-no spot," N.G. pointed to her pants and indicated that it was on the front side and would be covered by a bathing suit. (Tr. p. 418). N.G. stated that the touching had occurred "during the night" while she was on the couch, in the living room. (Tr. p. 419). During that same interaction, N.G. testified that Penninger directed N.G. to touch "[h]is no-no spot" with her hand and that it felt "[s]limy." (Tr. pp. 420, 422). N.G. added that Penninger told her to keep it a secret. Over Penninger's hearsay objections, Nurse Cook testified as to her findings and the statements that N.G. made during her medical examination, including the fact that N.G. had identified Penninger as the perpetrator. After the State rested its case-in-chief, Penninger moved for a directed verdict as to Count I, Class A felony child molesting, arguing that there was no evidence of penetration of the female sex organ. The trial court denied Penninger's motion. At the close of the evidence, the jury returned a guilty verdict on both Counts, and the trial court entered a judgment of conviction on the same. On August 27, 2015, the trial court held a sentencing hearing. The trial court imposed a term of forty years on Count I and five years on Count II, to run consecutively, for an aggregate sentence of forty-five years, fully executed in the Indiana Department of Correction.

[11] Penninger now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence*

[12] Penninger first claims that the State presented insufficient evidence to support his conviction for child molesting as a Class A felony. Our standard of review

for cases dealing with the sufficiency of evidence is well established. We will consider only the probative evidence and the reasonable inferences supporting the verdict in order to determine whether a reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Mastin v. State*, 966 N.E.2d 197, 201-02 (Ind. Ct. App. 2012), *trans. denied*. In so doing, we neither assess the credibility of witnesses nor reweigh the evidence. *Id.* at 202.

[13] In order to convict Penninger of Class A felony child molesting, the State was required to prove that he, being "at least twenty-one (21) years of age," "with a child under fourteen (14) years of age, perform[ed] or submit[ted] to sexual intercourse or deviate sexual conduct." I.C. § 35-42-4-3(a)(1) (2012). At the time of the offense, "deviate sexual conduct" was defined as "an act involving (1) a sex organ of one (1) person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." I.C. § 35-31.5-2-94 (2012). On appeal, Penninger contends that the State failed to carry its burden because there is no evidence of sexual deviate conduct. Specifically, Penninger asserts that no evidence was presented at trial to show that he penetrated N.G.'s sex organ by an object.[1]

[14] Penninger contends that the only evidence presented at trial establishes that Penninger *touched* "the inside and outside of [N.G.'s] no-no spot," but it is

---

[1] Both parties agree that the first part of the statute for establishing deviate sexual conduct, *i.e.*, an act involving a sex organ of one person and the mouth or anus of another person, is not relevant given the facts of this case. I.C. § 35-31.5-2-94(1) (2012).

unclear whether that touching amounted to a penetration. (Appellant's Br. p. 8). Additionally, Penninger directs our attention to the testimony of Nurse Cook, who stated that there was no medical or physical evidence of penetration. Accordingly, Penninger insists that his case is analogous to *Spurlock v. State*, 675 N.E.2d 312, 315 (Ind. 1996), *on reh'g*, in which our supreme court stated that "evidence of a touching without more does not support a conviction for child molesting as a Class A felony, which requires 'penetration of the female sex organ.'"[2] In *Spurlock*, "[t]he victim testified that Spurlock's penis touched her vagina; however, she never said that it penetrated or went inside, and explicitly said that she did not know whether that occurred." *Id.* In addition, "there was no medical or physical evidence of penetration." *Id.* Thus, the supreme court determined that there was insufficient evidence to sustain Spurlock's conviction. *Id.*

[15]  We find the present case to be sufficiently distinct from *Spurlock*. Although Penninger is correct in his assertion that there is no medical or physical evidence of penetration, which Nurse Cook explained is not abnormal in these types of cases, unlike in *Spurlock*, there is testimony in the present case that Penninger's hand penetrated N.G.'s sex organ. It is well established that "proof of the slightest penetration is enough to support a conviction." *Id.* In addition, the deviate sexual conduct statute "does not require that the vagina be

---

[2] Although the alleged Class A felony child molesting act in *Spurlock* was sexual intercourse rather than deviate sexual conduct, both definitions require penetration of the sex organ—the former "by the male sex organ" and the latter "by an object." *See* I.C. §§ 35-31.5-2-94; -302 (2012).

penetrated, only that the female sex organ, including the external genitalia, be penetrated." *Smith v. State*, 779 N.E.2d 111, 115 (Ind. Ct. App. 2002), *trans. denied*. Here, N.G. clearly testified at trial that Penninger touched "[b]oth" the inside and outside of her "no-no spot" with his hand, and she knew his hand was on the inside of her sex organ because she "could feel it." (Tr. p. 419). *See Smith*, 779 N.E.2d at 115 ("[A] detailed anatomical description of penetration is unnecessary."). Furthermore, Nurse Cook testified that, during her examination of N.G., N.G. described that Penninger "touched her privacy with his hand"—identifying her "privacy" as "where she goes pee from." (Tr. p. 347). N.G. stated that "it was on her skin," "on the inside," and that she saw some blood in her underwear afterwards. (Tr. p. 347). N.G. also indicated that Penninger hurt her, explaining "that it made her privacy feel like a needle." (Tr. p. 347). As Nurse Cook illustrated, an unestrogenized hymen such as N.G.'s is "extremely painful to touch." (Tr. p. 357). Accordingly, based on this evidence, we find that the jury had sufficient evidence from which it could conclude that Penninger penetrated N.G.'s sex organ with an object—that is, his hand.

## II. *Hearsay*

[16] Penninger next claims that the trial court abused its discretion by admitting hearsay testimony into evidence. The admission or exclusion of evidence "is squarely within a trial court's discretion and we accord it great deference on appeal." *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). We will not reverse a trial court's ruling on an evidentiary matter "unless it is clearly

contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law." *Id.*

[17] In this case, Penninger challenges Nurse Cook's testimony regarding the disclosures N.G. made during her medical examination, particularly the identification of Penninger as the perpetrator. According to Penninger, this testimony was hearsay and should have been excluded. "Hearsay" is defined as a statement that: "(1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is inadmissible unless a specific exception to the hearsay rule applies. Evid. R. 802. One particular exception permits the admission of a statement that: "(A) is made by a person seeking medical diagnosis or treatment; (B) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (C) describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause." Evid. R. 803(4).

[18] The Rule 803(4) exception "is grounded in a belief that the declarant's self-interest in obtaining proper medical treatment makes such a statement reliable enough for admission at trial." *VanPatten*, 986 N.E.2d at 260. In other words, the Rule 803(4) exception for hearsay "reflects the idea that people are unlikely to lie to their doctors because doing so might jeopardize their opportunity to be made well." *Id.* In order for a statement to be admissible under Rule 803(4), courts must engage in a two-step analysis. "First, 'is the declarant motivated to provide truthful information in order to promote diagnosis and treatment,' and

second, 'is the content of the statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment.'" *Id.* (quoting *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)).

[19] As to the first prong, Penninger argues that "there was no testimony offered by [Nurse] Cook that she checked to ensure that N.G.'s disclosures were motivated to provide truthful information for diagnosis or treatment. No evidence was presented to show that [Nurse] Cook reviewed with N.G. the importance of being truthful in her examination." (Appellant's Br. p. 11). During the trial, Penninger objected to Nurse Cook's testimony only to the extent of preventing her from revealing N.G.'s identification of Penninger as the perpetrator of the molestation. In fact, Penninger explicitly limited his objection to the revelation of his name, stating that he was not otherwise objecting "to the context of things" and that Nurse Cook could "certainly" testify as to "the specifics of what [N.G.] described" under the hearsay exception. (Tr. pp. 328, 341). Because, as the State points out, Penninger essentially conceded to "the adequacy of the foundation establishing that N.G. was motivated to provide truthful information to Nurse Cook" by limiting his objection to N.G.'s identification, we find that Penninger has waived this argument for appeal. (State's Br. pp. 14-15). *See, e.g., Jackson v. State*, 712 N.E.2d 986, 988 (Ind. 1999) (stating that the defendant was "limited on appeal to the grounds advanced at the trial court and [could not] raise new grounds for the first time on appeal").

[20] With respect to the second prong of the analysis, our courts have previously determined that "[s]tatements made by victims of sexual assault or molestation

about the nature of the assault or abuse—*even those identifying the perpetrator*—generally satisfy the second prong of the analysis because they assist medical providers in recommending potential treatment for sexually transmitted disease, pregnancy testing, psychological counseling, and discharge instructions." *VanPatten*, 986 N.E.2d at 260 (emphasis added). Here, however, Penninger contends that "there is direct testimony that the expert in the field did not reasonably rely on the [identification of Penninger] in rendering a diagnosis or treatment of N.G." (Appellant's Br. p. 11). More specifically, Penninger asserts that "[Nurse] Cook specifically testified that she could not think of any medical reason why she would need the name of [Penninger]." (Appellant's Br. p. 10). Penninger further argues that the identification of the perpetrator was not necessary for a diagnosis or treatment because Nurse Cook "testified that there were no concerns for sexually transmitted diseases with N.G., and that no follow up was done with respect to counseling or a safety plan." (Appellant's Br. p. 10). We disagree.

[21] Although Penninger has cherry-picked and mischaracterized excerpts from Nurse Cook's testimony, a review of the testimony as a whole establishes that she relied on N.G.'s identification of Penninger as the perpetrator as part of her treatment plan for N.G. Nurse Cook testified that it is her regular practice to obtain the name of the alleged perpetrator as "part of the safety plan for the child" because she "needed to identify how . . . this was happening to her, where that source was coming from." (Tr. pp. 335, 339). Nurse Cook "would certainly want to be sure that the child is . . . going home in a safe environment

and not going home to somebody who could potentially be causing harm to the child." (Tr. pp. 337); *see, e.g., Perry v. State*, 956 N.E.2d 41, 49 (Ind. Ct. App. 2011) (quoting *Nash v. State*, 754 N.E.2d 1021, 1024-25 (Ind. Ct. App. 2001) ("The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household.")). In this case, Nurse Cook recommended that N.G. "follow up [with her physician] for any new signs of infection," and she also recommended counseling. (Tr. p. 338). In response to Penninger's questions, Nurse Cook stated that it would not be essential to have a perpetrator's identification "[i]n reviewing the body parts" with the victim and that there is not a "medical only" reason for identifying a perpetrator. (Tr. pp. 335-36). Nevertheless, it is not the role of this court to reweigh evidence, and Nurse Cook testified that the perpetrator's identification is relevant "as part of the holistic care, so that would . . . be part of the nursing plan, which would . . . fall under the definition of medical." (Tr. p. 335). Accordingly, we cannot say that the trial court abused its discretion by admitting Nurse Cook's testimony pursuant to Evidence Rule 803(4).

## CONCLUSION

[22] Based on the foregoing, we conclude that the State presented sufficient evidence to support Penninger's conviction for Class A felony child molesting. We further conclude that the trial court acted within its discretion in admitting the testimony of Nurse Cook under Indiana Evidence Rule 803(4).

[23] Affirmed.

Kirsch, J. and Pyle, J. concur