**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MARK A. BATES**
Lake County Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| CURTIS F. SAMPLE, JR., ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 45A03-1302-CR-52 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Clarence D. Murray, Judge
Cause No. 45G02-0602-FA-10

**September 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Curtis F. Sample, Jr. was convicted of attempted murder as a class A felony and criminal confinement as a class B felony, found to be a habitual offender, and sentenced to an executed term of ninety-five years in prison. Our Supreme Court later affirmed the convictions but reversed the habitual offender finding and remanded to the trial court for a new habitual offender hearing. *See Sample v. State*, 932 N.E.2d 1230 (Ind. 2010). In the present appeal, Sample appeals the finding upon remand that he is a habitual offender, presenting the following restated issue for review: Did the trial court commit reversible error in permitting prosecution witnesses to testify that the victim of two predicate offenses was mentally infirm?

We affirm.

The underlying facts were set out by this court in Sample's direct appeal, as follows:

In the summer of 2005, C.W. began taking care of her daughter's Gary apartment while her daughter worked in another state. By January of 2006, C.W. had vacated her own apartment and moved into her daughter's apartment. During that time, Sample, who was known to C.W. by his nickname, B.C., possessed a key to the apartment. C.W.'s daughter, who had been dating Sample, had given him the key before she moved.

Before moving into the apartment, C.W. had met Sample on several occasions while visiting her daughter. After moving into her daughter's apartment, C.W. twice encountered him. The first time, he let her into the apartment after she had locked herself out. The second time, she came home and discovered him with a woman in one of the bedrooms. C.W. made Sample leave the apartment. Although she later asked her daughter and son to get the key back from Sample, he never returned it.

During the early morning of January 9, 2006, C.W. "was awakened by the presence of BC in the apartment." When asked what he was doing there, he replied that he needed somewhere to stay. C.W. informed him that he could not stay there and began following him down the hallway to the living room, "thinking he's going to go on out the door." He, however, turned and "back

2

handed" her, cutting her face with his ring. He then pulled out a large pocket knife and ordered her to go in the living room and lie down on the floor. She did as she was ordered, lying near the front door. Sample then went into the kitchen and retrieved a butcher knife.

As Sample was examining the knife, running "his thumb and forefinger ... up and down the blade as if to examine how sharp it was," C.W. fled the apartment. As she fled down a common hallway, C.W. "could feel the knife going in [her] back...." She fell outside a neighbor's door and started screaming. After she fell, Sample "went to jab at [her] with the knife." C.W., however, grabbed the blade. As she was still holding onto the blade, Sample "pulled [her] hair back, took the knife, and went around [one] ear ... and tried to go to the other side of [her] ear" with the knife. After the knife's blade broke, Sample began hitting C.W.'s head with his fist. He then pulled the pocket knife out of his pocket and began cutting her with it. During the attack, C.W. was screaming "and fighting with him[.]"

At approximately 1:30 a.m., Gary Police Officer Anthony Hawkins received a dispatch for "a rape and stabbing in progress." When he arrived at the main entrance to the apartment building, he "saw two people inside, one person ran towards the back, the other one was a black female. She was standing there, completely naked, covered in blood, huddled in the corner of the hallway."

*Sample v. State*, 910 N.E.2d 1290 (Ind. Ct. App. 2009) *vacated,* 932 N.E.2d 1230. As indicated above, our Supreme Court granted transfer, affirming the convictions but vacating the habitual offender finding and remanding to the trial court with instructions to conduct a new habitual offender hearing. The facts relevant to this appeal center upon the second habitual offender hearing.

In addition to proof of the present offenses, the State offered evidence of two predicate offenses in support of the habitual offender allegation. The first involved an April 27, 1993 conviction for criminal recklessness. The second was a February 6, 1997 conviction for robbery and battery. With respect to each offense, the State offered certified

3

documentation detailing the date each offense was committed, the date conviction was entered, and the date Sample was sentenced. In addition, with respect to each offense, the State called witnesses identifying Sample as the subject of those convictions. The alleged error that Sample cites in the present appeal stems from the testimony of two of the witnesses. Thomas Papadakis was a captain in the Gary Police Department Bureau of Investigations when he was called to testify at the second habitual offender hearing. He had participated in the investigation of the incident that led to Sample's 1993 conviction. He testified that the victim in that case knew Sample and identified Sample as the perpetrator. Papadakis was asked, "[D]id you have a recollection about the victim?" *Record* at 44. Over a defense objection, Papadakis described the victim as follows: "The victim was a little slow, like what you would call like a special, you know, I guess like special-education type of student, I believe – – I know he was in his late teens at the time and stuff." *Id*. at 45-46.

The second witness was Mary Ryan, who worked in the Lake County Prosecutor's Office at the time of the incident that led to Sample's second predicate conviction. She was asked whether she remembered prosecuting Sample's second conviction, and she responded that she did. When asked why she remembered it, she responded there had been legal issues that she had never encountered prior to that point in time. She explained:

> There was [sic] several legal issues that I never encountered before in going to trial, one of which involved mental health issues, and the other one involved what's called 404 (B) evidence, which means if you try and use evidence of a separate crime in your case, you have to go through a series of hearings to get permission from the Court to do that. And as a trial deputy, I'd never encountered that before, and actually had to make those arguments before. So it was something that was something that I remembered only because – – especially since it was the first time I ever had to deal with mental health

4

issues in front of the jury.

*Id.* at 55-56. She was asked whether those mental health issues were relevant to the case.

She responded:

> The victim in that case, Mr.— I believe it was Dennis Smith was his name, he had some medical issues that he had had some mental health treatment and that he was on certain types of medication. And there was question [sic] about whether the medications affected his ability to remember things, and whether he could testify about certain things. And so we had to go through hearings to make that determination ahead of time before the court allowed that testimony to come in.

*Id.* at 56-57. It turns out that both predicate offenses were committed upon the same victim – a young man with mental health issues. Upon appeal, Sample argues that the trial court erred in admitting the foregoing testimony of Papadakis and prosecutor Ryan because it "could also persuade the jury that Sample was truly depraved because he robbed a person who is mentally deficient." *Appellant's Brief* at 8.

The decision whether to admit or exclude evidence at trial is committed to the trial court's discretion, and that exercise of discretion will be afforded great deference on appeal. *VanPatten v. State*, 986 N.E.2d 255 (Ind. 2013). We will not reverse such decisions unless they are clearly contrary to the logic and effect of the facts and circumstances of the case or misinterpret the law. *Id.*

We begin with Sample's claim that the evidence in question was inadmissible because it was irrelevant. Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. To be "relevant,"

5

evidence "need only have some tendency, however slight, to make the existence of a material fact more or less probable, or tend to shed any light upon the guilt or innocence of the accused." *Smith v. State,* 982 N.E.2d 393, 402 (Ind. Ct. App. 2013), *trans. denied*. Our Supreme Court has observed that "to be properly admissible, real evidence need only constitute a small but legitimate link in the chain of evidence connecting the defendant with the crime." *Malone v. State,* 700 N.E.2d 780, 782 (Ind. 1998).

Ryan and Papadakis were called as witnesses to help establish that Sample was the defendant who had been convicted of the two predicate crimes, as alleged. Because the two crimes and ensuing prosecutions happened years before the second habitual offender trial, the State sought to strengthen their identifications of Sample by establishing that Ryan and Papadakis had independent recollections of the predicate offense with which she and he, respectively, had been involved. In both cases, the witnesses testified that they were able to recall the prior case involving Sample because the victim had been mentally infirm. In view of the fact that it had been eighteen and fourteen years, respectively, between those two prior offenses and the present offense, this evidence was at least marginally relevant in that it bolstered their claims that they remembered Sample was the subject of those proceedings. Therefore, the evidence was relevant.

We now proceed to the second rationale offered in support of Sample's challenge to the testimonies of Ryan and Papadakis. Sample objected to Papadakis's testimony initially by stating simply, "relevance." *Transcript* at 45. When asked by the trial court to elaborate, Sample's attorney explained, "Your Honor, he's already – there is no reason to dispute that

he is a competent witness, and that he's testifying to the best of his recollection." *Id.* Moments later, during Ryan's testimony, she was asked, "[w]hat about that case makes it stand out in your mind?" *Id.* at 55. She responded, "There was [sic] several legal issues in that case that I never encountered before as a trial deputy." *Id.* At this point, Sample's attorney interjected, "Objection, your Honor, relevance." *Id.* This was all of the argument offered in support of the second objection. Ryan went on to testify as to the nature of the legal issue that had made the case memorable for her. In the course of that explanation, Ryan divulged that the victim had received mental health treatment. This testimony was subject only to a continuing objection "as to relevance." *Id.* at 56.

Upon appeal, Sample presents an argument that he did not articulate to the trial court, i.e., that the prejudicial impact of the challenged evidence prevented him from receiving a fair trial. The State contends that because this argument was not articulated at trial, the issue is waived. In his Reply Brief, Sample counters with the rhetorical question, "How much more specific could Sample be when he objected on the grounds of relevancy?" *Reply Brief* at 2. He continues that he was not required to articulate his reasoning more specifically than he did. Essentially, he claims that a general objection on relevancy grounds is sufficiently specific to preserve the argument that the evidence, even if relevant, was unduly prejudicial.

Sample is indeed limited on appeal to the grounds advanced below, and he cannot now raise new grounds for the first time on appeal. *See Jackson v. State*, 712 N.E.2d 986 (Ind. 1999). Our Supreme Court has held that an objection only to relevance preserves the issue of admissibility under both Rules 401 and 403 of the Indiana Rules of Evidence. *Id.* The

7

former defines "relevant evidence", while the latter addresses the element of prejudice. Evid. R. 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Accordingly, an objection on the basis of relevance preserves the argument that the evidence in question, even if relevant, should be excluded because its prejudicial impact outweighs its probative value. *See*, *e.g.*, *Camm v. State*, 908 N.E.2d 215 (Ind. 2009); *Jackson v. State*, 712 N.E.2d 986.

We have already explained our conclusion that the challenged testimony of Papadakis and Ryan was relevant. Sample's claim that the evidence should be excluded because of its prejudicial impact is premised upon his claim that the evidence disinclined the jury to exercise its discretion to be merciful, i.e., to absolve Sample of habitual offender status notwithstanding that he committed the requisite predicate offenses. In support of this contention, Sample cites the dissenting opinion in *Hollowell v. State*, 753 N.E.2d 612 (Ind. 2001). *In Hollowell*, the defendant stipulated to the two predicate offenses supporting a habitual offender allegation. Nevertheless, the State introduced into evidence the chronological case summary (CCS) pertaining to those convictions. With respect to one, a thorough reading of the CCS indicated that the defendant was initially charged with attempted murder, but subsequently pled guilty to and was convicted of battery, which was one of the predicate offenses. The Court noted, however, that the CCS mistakenly indicated that the defendant was actually convicted of attempted murder. The defendant challenged

8

introduction of the CCS on two grounds. First, he contended the CCS was not necessary because he stipulated to the prior convictions. Second, he contended the CCS was unduly prejudicial because it erroneously indicated he had been convicted of attempted murder.

In the present case, the second of the *Hollowell* defendant's complaints is not an issue. That is, Sample cannot complain that the challenged information provided by Ryan in Papadakis was factually incorrect. This leaves us with the first contention, i.e., that the case chronology was unnecessary to prove the existence of the predicate offenses. Our Supreme Court rejected this contention in *Hollowell*. In fact, the Court noted that because "the jury has discretion to determine whether a defendant is a habitual offender 'irrespective of the uncontroverted proof of prior felonies' … the facts regarding the predicate convictions are relevant to the jury's decision whether or not to find a defendant to be a habitual offender." *Id.* at 617 (quoting *Seay v. State*, 698 N.E.2d 732, 737 (Ind. 1998)). Clearly, the Court was alluding to the "mercy" discretion accorded to the jury, as established in *Seay*. Thus, the Supreme Court indicated in *Hollowell* that "facts regarding the predicate convictions" are relevant to the jury's decision whether a defendant who has committed the requisite predicate offenses deserves to be given an enhanced sentence, and therefore are admissible. *Id.* Sample urges us to adopt the contrary view expressed by Justice (now Chief Justice) Dickson and Justice Rucker in *Hollowell*. It is not within our prerogative to do so, as that view was expressed in a dissenting opinion, and did not carry the day. Pursuant to *Hollowell*, the trial court did not err in permitting Ryan and Papadakis to testify about the memorable aspect of the case in which each was, respectively, involved.

Judgment affirmed.

BAKER, J., and VAIDIK, J., concur.