# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 23 2019, 10:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald C. Swanson, Jr.
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jared L. Haynes,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 23, 2019

Court of Appeals Case No.
18A-CR-2657

Appeal from the Allen Superior Court

The Honorable Frances C. Gull, Judge

Trial Court Cause No.
02D05-1804-F1-5

**Crone, Judge.**

# Case Summary

A jury convicted Jared L. Haynes of level 1 felony rape of a severely disabled woman. He appeals his conviction, challenging the admissibility of certain statements to medical providers and information provided by a sign language interpreter. He also appeals his forty-year executed sentence, claiming that it is inappropriate in light of the nature of the offense and his character and challenging his designation as a credit-restricted felon. Finding that the trial court erred by including an entry listing Haynes as a credit-restricted felon, we remand with instructions to correct that error. In all other respects, we affirm.

# Facts and Procedural History

A.F. is a young adult who was diagnosed with cerebral palsy shortly after her birth. She was declared incompetent by a court and is under the guardianship of her sister, Trista Morrow, with whom she lives. She has an IQ of 40, the overall developmental skills of a five-year-old, and the communication skills of a three-year-old. Her left hand is completely deformed due to the cerebral palsy, and she communicates primarily through sign language, cooing noises, and the limited printing of letters/words.

Haynes has been best friends with A.F.'s father for decades and was always known by A.F. and Morrow as "Uncle Jared." Tr. Vol. 2 at 145-46. He has known the sisters for their entire lives and helped A.F. learn to walk. His involvement with the family decreased as the sisters grew, but they continued to see him approximately every other month or at family gatherings.

[4]     In April 2018, Haynes was homeless and asked Morrow if he could sleep at her house, take a shower, and do laundry.  She agreed, and he slept on the sofa while she worked the midnight shift.  The next morning, when Haynes left, he told her that he would contact her later in the day.  He did, and she agreed to feed him dinner at her house.  When Haynes arrived at 7:00 p.m., he told Morrow that he was going to run to the gas station two blocks from her house to buy a soda.  He asked if he could take twenty-eight-year-old A.F. with him, and Morrow agreed, expecting them to return in about five minutes.

[5]     Haynes did not take A.F. to the gas station.  Instead, he took her to a park, stopped his pickup, bound her hands, and removed her clothing.  He penetrated her vagina and, despite her objections, continued to perform sexual intercourse until he ejaculated and she bled.  He pointed what appeared to be a handgun at her head and threatened to kill both her and Morrow if she told anyone.

[6]     Meanwhile, Morrow became concerned about A.F. and texted Haynes. Though initially he did not respond, Haynes later texted Morrow and indicated that he and A.F. were still at the gas station.  Morrow continued to wait, and when Haynes and A.F. still did not return, she called Haynes, who told her that he had taken A.F. for ice cream.  He indicated that he would have A.F. home in fifteen to twenty minutes.  When another twenty minutes elapsed, the increasingly concerned Morrow texted Haynes, who failed to respond.  She then called him, and he said that they were "right around the corner" and abruptly ended the call.  *Id*. at 152.  By this time, A.F. had missed her 8:00 p.m. dose of anti-seizure medication, so Morrow sent Haynes a text indicating that

A.F. needed to take her medication. When he failed to respond, she texted him that she was calling the police. She attempted to call him again, but his phone went straight to voicemail.

[7] After a total of three and a half hours, Morrow saw Haynes circle the block twice. Haynes eventually stopped, shoved A.F. out of his truck, and "raced out of there … like a bat out of hell." *Id.* at 158, 187. The disheveled A.F. was crying and shaking as she tried to communicate to Morrow what Haynes had done to her. Her pants were twisted and bloody, her bra was unfastened, her shoes were untied, and her sock was missing. Her wrists were red, and she indicated to Morrow that Haynes had tied her hands.

[8] Shortly after the police arrived, A.F. was transported by ambulance to a local hospital. After her initial treatment, she was transferred to a sexual assault center. An independent sign language interpreter was called in to facilitate communication between A.F. and medical personnel. Sexual assault nurse Sarah Coburn performed a medical examination, and swabs of A.F.'s genitals and anus were sent to the Indiana State Police Laboratory. The DNA test results were consistent with Haynes's DNA. Police subsequently searched Haynes's truck pursuant to a search warrant. The search produced rope, a ball of twine and cords, two machetes, and a pistol that turned out to be a BB gun.

[9]     The State charged Haynes with level 1 felony rape and level 3 felony rape. During his jury trial, the trial court admitted, over his hearsay objection,[1] Nurse Coburn's testimony and medical examination notes, some of which include A.F.'s statements as communicated to Coburn by the sign language interpreter. These notes, read into evidence by Coburn, read as follows:

> Patient communicates by using sign language, ASL interpreter present. "He drove over, just me and him drive around. He tied my wrist. Shoelace. He pulled my pants down. He smacked me in the face." I clarified patient points to right cheek. Patient then again is stating through the interpreter, "I pushed him. I asked him to drive me home. I talked. He put his finger on my mouth. I told him don't. He had a gun under the seat. He pushed me. He said he would get us soda, but we didn't. He took my pants off and underwear." She – again I clarified and she denied that a condom was used. She clarifies penis in vagina. "It was big. Kissed my cheek and forehead, kissed neck," patient clarified by pointing to right neck. Positive ejaculation. "I saw Sam pull up in the car. Jared said he would shoot me and Trista in the head. Jared got out of the car and kicked me and pushed me out of the car. He said, 'Come on.' He pointed the gun at my stomach. When we got home, he took the shoelace off. He smoked and he tried to give it to me. I was in the front seat of the truck. I was on my back and he was on my stomach. He pulled off by the river." And then I clarified with A.F. and she indicated that she had vaginal pain and vaginal bleeding.

Tr. Vol. 3 at 31-32.

---

[1] Haynes also objected on grounds of bolstering. He does not appeal his bolstering claim.

[10] The jury convicted Haynes as charged. At sentencing, the trial court merged the level 3 felony conviction into the level 1 felony conviction and sentenced Haynes to forty years executed. Haynes now appeals his conviction and sentence. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – Haynes waived consideration of his claim that the trial court erred in admitting A.F.'s statements to her medical provider through a sign language interpreter.

[11] Haynes challenges the trial court's admission of A.F.'s statements to Nurse Coburn, made through a sign language interpreter, during her sexual assault examination. We review evidentiary rulings for an abuse of discretion resulting in prejudicial error. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). An abuse of discretion occurs when the trial court's ruling is either clearly against the logic and effect of the facts and circumstances before it or the court misinterprets the law. *Id*. In determining whether improperly admitted evidence has prejudiced the defendant, we assess the probable impact of that evidence on the jury in light of all the other properly admitted evidence. *Id*. If independent, properly admitted evidence of guilt supports the conviction, the error is harmless. *Id*.

[12] During Haynes's trial, the State introduced Nurse Coburn's testimony concerning A.F.'s medical history as well as her medical examination notes that included statements by A.F. during her medical examination at the sexual assault treatment center. Haynes objected on hearsay grounds. Hearsay is an

out-of-court statement offered to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay is generally inadmissible, subject to certain exceptions. Ind. Evidence Rule 802; *Harrison v. State*, 32 N.E.3d 240, 254 (Ind. Ct. App. 2015), *trans. denied*. "One such exception generally permits statements made for the purpose of medical diagnosis or treatment to be admitted into evidence, even when the declarant is available. Ind. Evidence Rule 803(4)." *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). Rule 803(4) requires that the statements be "made by a person seeking medical diagnosis or treatment;" who made the statement "for—and reasonably pertinent to—medical diagnosis and treatment; … and [whose statement] describes medical history; or past or present symptoms, pain, or sensations; their inception; or their general cause." This exception is based on the "belief that the declarant's self-interest in obtaining proper medical treatment makes such a statement reliable enough for admission at trial." *VanPatten*, 986 N.E.2d at 260. In other words, the medical diagnosis and treatment exception is predicated on the notion that "people are unlikely to lie to their doctors because doing so might jeopardize their opportunity to be made well." *Id*. In analyzing the admissibility of statements under this exception, we employ a two-step analysis: (1) "is the declarant motivated to provide truthful information in order to promote diagnosis and treatment;" and (2) "is the content of the statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment." *Id*. (quoting *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)).

[13] Haynes concedes the second prong and challenges only the first, claiming that the State failed to establish that A.F. was motivated to be truthful in order to promote treatment or diagnosis. *See VanPatten*, 986 N.E.2d at 260 (to establish the first prong, "the declarant must subjectively believe that he was making the statement for the purpose of receiving medical diagnosis or treatment.") The *VanPatten* court explained that while determining subjective belief is relatively simple with adult declarants, the determination is much more difficult where the declarant is a young child and might lack the ability to link truthful responses with medical treatment. *Id*. at 261. In such cases, the proponent must present foundational evidence to affirm that the child understood the medical provider's role. *Id*.

[14] Haynes analogizes A.F. to a young child, due to her severe developmental disabilities, and now argues that her statements were inadmissible without an additional foundation to show that she had the ability to understand the link between truthful answers and medical treatment. "[A]n objection asserting a lack of adequate foundation must be made at the time the foundation is being laid." *Marlatt v. State*, 715 N.E.2d 1001, 1002 (Ind. Ct. App. 1999). Haynes made no such objection at trial. As such, he has waived this claim for review. *Id*.[2]

---

[2] Even so, we note the State's observation that as a twenty-eight-year-old adult with a lifetime of health issues, A.F. "would inevitably have had extensive experience speaking to medical professionals, making her unlike most small children to which the concerns that motivated *VanPatten*'s requirements apply." Appellee's Br. at 18. We agree that A.F. does not fit neatly into the category of a child declarant for purposes of

## Section 2 – Haynes has failed to demonstrate that the admission of the sign language interpreter's statements constituted fundamental error.

[15] Haynes also contends that he was denied his constitutional right to confront and cross-examine the sign language interpreter, who did not testify at trial. Because he failed to object on this basis at trial, he now raises it as fundamental error. "[A] claim waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred." *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010) (citation omitted). Fundamental error is an extremely narrow exception to the waiver rule and exists only where the trial court's errors are so prejudicial that they make a fair trial impossible. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). The fundamental error doctrine "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Covey v. State*, 929 N.E.2d 813, 819 (Ind. Ct. App. 2010). "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred[.]" *Ryan*, 9 N.E.3d at 668 (citation and quotation marks omitted). "[T]he mere fact that a constitutional right is implicated is

---

*VanPatten*'s first-prong analysis under Evidence Rule 803(4). Finally, we note that the record includes sufficient independent, properly admitted evidence to support Haynes's guilt.

insufficient to satisfy the fundamental error rule." *Hollingsworth v. State*, 987 N.E.2d 1096, 1099 (Ind. Ct. App. 2013), *trans. denied*.

[16] Here, Haynes asserts that he was denied his constitutional right to confront and cross-examine the sign language interpreter, who did not testify at trial.[3] The Sixth Amendment to the United States Constitution states in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." Witnesses are those "who bear testimony," which is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford v. Washington*, 541 U.S. 36, 51 (2004). "The Sixth Amendment prohibits the introduction of testimonial statements by a non-testifying witness unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ward v. State*, 50 N.E.3d 752, 757 (Ind. 2016) (quoting *Crawford*, 541 U.S. at 54). In *Davis v. Washington*, the U.S. Supreme Court explained that in making the determination as to whether statements are testimonial, the court must analyze the "primary purpose" of those statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is

---

[3] He cites both the Sixth Amendment and Article 1, Section 13 of the Indiana Constitution but indicates that his federal and state arguments are based on the same reasoning.

> to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822 (2006). Although the *Davis* court specifically reserved the question of whether statements to persons other than law enforcement officers would raise similar Confrontation Clause concerns, the U.S. Supreme Court later extended the Confrontation Clause's reach to include statements to persons other than law enforcement, subject to the primary purpose test. *Ward*, 50 N.E.3d at 757-759 (citing *Davis*, 547 U.S. at 823 n.2); *see Ohio v. Clark*, ___ U.S. ___, 135 S. Ct. 2173 (2015) (emphasizing that statements to nurses, doctors, and other non-law enforcement persons are much "less likely to be testimonial" and that courts must evaluate challenged statements in context to ensure conversation is not primarily to create out-of-court substitute for trial testimony).

[17] Here, the challenged statements were made by A.F. to Nurse Coburn through the sign language interpreter in the context of a medical examination. Nurse Coburn testified at trial and was subject to cross-examination. Throughout the reading of her medical examination notes, Nurse Coburn repeatedly indicated that she sought clarification of what A.F. was saying through the interpreter. *See* Tr. Vol. 3 at 31-32 ("I clarified patient points …. again I clarified …. She clarifies penis in vagina …. Patient clarified by pointing …. then I clarified with A.F. and she indicated that she had vaginal pain and vaginal bleeding."). The interpreter was not part of the police force. Nor was she employed by the sexual assault center. Rather, she was from an independent organization and

was simply called in to relay what A.F. communicated to her via sign language. In other words, the interpreter was merely a conduit, not unlike a court reporter, who simply records what he/she hears. As such, the interpreter provided no information of her own and did not create an out-of-court substitute for trial testimony. *See Clark*, 135 S. Ct. at 2180. Her information therefore was nontestimonial.

[18] Moreover, we note that the information that the interpreter provided, and Nurse Coburn recorded, was consistent with and corroborated by the testimony of A.F. and other witnesses, most notably Morrow, who observed and communicated directly with A.F. immediately after the rape and who had a lifetime of experience interpreting A.F.'s signs. Thus, the interpreter's statements were cumulative of properly admitted evidence, and her absence from trial did not make a fair trial impossible. As such, Haynes has failed to meet his burden of demonstrating fundamental error. Therefore, we affirm his conviction.

## Section 3 – Haynes has failed to meet his burden of demonstrating that his sentence is inappropriate in light of the nature of his offense and his character.

[19] Haynes asks that we review and revise his sentence pursuant to Indiana Appellate Rule 7(B), which states that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." When a defendant requests appellate review and

revision of his sentence, we have the power to affirm or reduce the sentence. *Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010). In conducting our review, our principal role is to leaven the outliers, focusing on the length of the aggregate sentence and how it is to be served. *Bess v. State*, 58 N.E.3d 174, 175 (Ind. 2016); *Foutch v. State*, 53 N.E.3d 577, 580 (Ind. Ct. App. 2016). This allows for consideration of all aspects of the penal consequences imposed by the trial court in sentencing, i.e., whether it consists of executed time, probation, suspension, home detention, or placement in community corrections, and whether the sentences run concurrently or consecutively. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). We do "not look to see whether the defendant's sentence is appropriate or if another sentence might be more appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Foutch*, 53 N.E.3d at 581 (quoting *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied* (2014)). The defendant bears the burden of persuading this Court that his sentence meets the inappropriateness standard. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016).

[20] In considering the nature of Haynes's offense, "the advisory sentence is the starting point the Legislature has selected as an appropriate sentence." *Green v. State*, 65 N.E.3d 620, 637-38 (Ind. Ct. App. 2016), *trans. denied* (2017). When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that "makes it different from the

typical offense accounted for by the legislature when it set the advisory sentence." *Holloway v. State*, 950 N.E.2d 803, 807 (Ind. Ct. App. 2011).

[21]     The trial court sentenced Haynes to the maximum term of forty years for level 1 felony rape. *See* Ind. Code § 35-50-2-4(b) (level 1 felony carries sentencing range of twenty to forty years, with thirty-year advisory term). "Maximum sentences are generally reserved for the worst offenders, but this category encompasses a considerable variety of offenses and offenders." *Bethea v. State*, 964 N.E.2d 255, 268 (Ind. Ct. App. 2012), *aff'd. in relevant part by Bethea v. State*, 983 N.E.2d 1134 (2013). "Our standard is not whether a worse offender could be imagined, but instead focuses 'on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.'" *Id*. at 269 (quoting *Wells v. State*, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), *trans. denied*).

[22]     The nature of Haynes's offense is gut-wrenching. Under the pretense of taking the severely disabled A.F. to the gas station for a soda, "Uncle Jared" took her to a remote location, bound her palsied hands, pointed a gun at her,[4] and threatened to kill her and her sister if she told anyone. She did not have the physical ability even to scream as he violently raped her and caused her to suffer vaginal tears and serious pain. But the physical pain was only part of the trauma. The emotional damage to the vulnerable twenty-eight-year-old victim

---

[4] The fact that the gun turned out to be a BB gun is inconsequential, as it was similar in appearance to a real handgun and accomplished its purpose of frightening the victim into submission.

with the cognitive ability of a five-year-old and communication ability of a three-year-old has been pronounced and protracted. A.F.'s note to Haynes, in which she did her best to describe her thoughts and emotions, underscores her intense fear and confusion that ensued. State's Ex. 3. Morrow, her sister and guardian, described the devastating effect of the rape on A.F.'s demeanor. Though severely disabled from childhood, A.F. had managed to maintain a joyful disposition. After the life-altering rape, she repeatedly had nightmares about Haynes. She panicked when she saw a pickup truck similar to Haynes's or heard noises similar to those made by his truck. She became deathly afraid not only to *go* outside but even to *see* the outside from the windows of her home. She was overcome and fled the courtroom when Haynes made direct eye contact with her during sentencing. Simply put, the nature of Haynes's offense is among the worst of the worst and does not militate toward a shorter sentence.

[23] Likewise, Haynes's character does not militate toward a shorter sentence. We conduct our review of his character by engaging in a broad consideration of his qualities. *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*, 11 N.E.3d 571. "When considering the character of the offender, one relevant fact is the defendant's criminal history." *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied* (2016). Haynes maintains that because his criminal record includes no prior sexual offenses, he deserves a shorter sentence with a portion suspended. His criminal history comprises four misdemeanor convictions, including battery with bodily injury, disorderly conduct, and two convictions for operating while suspended, as well

as two felony convictions for nonsupport of a dependent. As of the October 2018 date of the presentence investigation report, Haynes had two pending felony nonsupport causes in another county. He has twice failed to respond to more lenient sentencing options, with one probation revocation and one modification from probation to work release. His repeated failure to pay his child support obligations for several of his children underscores his disregard for the law and his children.

[24] Criminal history notwithstanding, we find Haynes to be an opportunist who breached his position of trust and took advantage of kindnesses offered him by A.F.'s family. Haynes claims that he lacked a particularly close relationship to A.F., such as that of a parent and child, and that therefore his violation of trust did not rise to the point of meriting a harsher sentence. *See Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011) (harsher sentence is more appropriate when violation of trust arises from particularly close relationship between defendant and victim such as parent-child relationship). We disagree. The record shows that for decades Haynes was a close friend of A.F.'s father, so close that A.F. and Morrow referred to him as their uncle.[5] He helped A.F. learn to walk when she was two years old. At one point, when he was experiencing hard times, Morrow paid for his cell phone and service. When he was homeless and asked for help, Morrow fed him and allowed him to stay at the home that she shared

---

[5] Haynes subsequently characterized the sex as merely consensual sex between two people who wanted to marry. This claim belies his argument that he did not have a particularly close relationship with A.F.

with A.F. Because A.F. was essentially helpless, Morrow did not entrust her to others to go places. She entrusted A.F. to Haynes's care for a quick trip for a soda, and Haynes repaid her kindnesses by betraying A.F.'s and her family's trust in an egregious way. Haynes was keenly aware of A.F.'s limitations and brutally took advantage of her frail and palsied body. As a result, A.F.'s joyful outlook turned into a protracted nightmare. In terms of victim impact, this is among the worst of the worst.

[25] Moreover, we believe Haynes's statement in allocution to be reflective of his true character. In that statement, he repeatedly called A.F. and her family liars. He accused the family of making A.F. "hate and mistrust" him and said, "may the curse of God be on every one of you. That is my remorse." Tr. Vol. 3 at 219. As the trial court observed, "A.F. could no more string together a lie than she could speak coherently. She is tremendously compromised." *Id*. at 221. Haynes's attempts at projecting are grotesque.

[26] In sum, Haynes has failed to meet his burden of demonstrating that his forty-year sentence is inappropriate in light of the nature of his offense and his character. Accordingly, we affirm his sentence.

## Section 4 – The trial court erred in designating Haynes a credit-restricted felon.

[27] Finally, we address Haynes's assertion that the trial court erred in including the following entry in the judgment of conviction: "defendant is a credit restricted felon." Appealed Order at 1. Haynes correctly asserts that he does not meet

the definition of a credit-restricted felon under Indiana Code Section 35-31.5-2-72. The State concedes the error. As such, we remand with instructions to correct the error.

[28] Affirmed and remanded.

Bradford, J., and Tavitas, J., concur.